**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| TARGET GLOBAL LOGISTICS SERVICES, CO. : | |
| : | |
| Plaintiff/Counterclaim Defendant : | |
| v. : | CIVIL ACTION NO. |
| : | 15-4960 |
| KVG, LLC : | |
| : | |
| Defendant/Counterclaim Plaintiff : | |
| v. : | |
| : | |
| QAIS ANIL MEDICAL EQUIPMENT COMPANY LTD : | |
| MOHAMMAD SEDIQ and ASIA PHARMA LTD : | |
| : | |
| Counterclaim Defendants : | |

_____

**Henry S. Perkin, M.J.**                                    **November 29, 2018**

## MEMORANDUM

Target Global Logistics Services, Co. ("Target"), a company located in Kabul,

Afghanistan, entered into two "Prime-Subcontractor Purchase Agreements" with KVG, LLC

("KVG"), a company located in Elizabethtown, Pennsylvania.  See Docket No. 27, Amended

Complaint ¶¶ 5-6, 8, 10.  These two Agreements required Target to act as a sub-contractor under

an agreement that KVG had entered into with the United States Government ("Government").

Id. ¶¶ 1, 6.  The Agreements called for Target to deliver certain medical equipment and supplies,

for which KVG was to pay Target $678,534.84 under the first Agreement (Shorabak Trauma

Center) and $179,136.48 under the second Agreement (Paktiya Medical Center).  Id. ¶¶ 8-11.

Although Target requested payment from KVG on October 15, 2014, KVG failed to pay for the

medical supplies and equipment that Target delivered.  Id. ¶ 13.

On June 22, 2016, KVG filed its First Amended Counterclaim against Target with a Joinder of three additional nonresident, Afghani Defendants, Qais Anil Medical Equipment Company Ltd, Mohammad Sediq, and Asia Pharma Ltd. The amended counterclaim against Target consists of two claims regarding the foregoing two transactions, as well as seven claims stemming from seven other transactions in 2013 and 2014 for which KVG did make payment as required. Each of KVG's claims against Target sound in breach of contract and/or breach of warranty. In eight of the nine claims, KVG avers that it suffered damages as a result of Target's delivery of nonconforming goods. KVG later sought entry of default against the three additional Afghani defendants (Qais Anil Medical Equipment Company Ltd, Mohammad Sediq, and Asia Pharma Ltd.), which the Clerk of Court entered.

On November 30, 2015, having obtained the consent of all parties in this case, the Honorable Joseph F. Leeson, Jr. ordered that this matter be transferred to this Magistrate Judge to conduct all further proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. See Docket No. 26. A non-jury trial was held before this Court on May 21-24, and 30, 2018 during which the parties presented evidence.[1] See Docket Nos. 208-212, 214-218. On August 30, 2018, counsel presented closings and post-trial argument to the Court. See Docket Nos. 228, 230.

Pursuant to Federal Rule of Civil Procedure 52, and after hearing all of the evidence in the case and determining the credibility of all witnesses, this Court enters its findings of fact and conclusions of law.

---

[1] By Stipulation of Counsel filed May 7, 2018, the parties stipulated and agreed to waive their respective rights to a jury trial, and consented to proceed in this matter with a non-jury bench trial before the undersigned.

# FINDINGS OF FACT

## I. Shorabak Contract

The Shorabak Trauma Center ("Shorabak") was a trauma center to be built by the Government for the Afghans before the U.S. and British forces were to leave Helmand Province, Afghanistan. (Notes of Testimony ("N.T.") 5/30/2018 at 10, 14.) On May 25, 2014, KVG entered into Contract No. W56KJD-14-P-0128 with the Government for the delivery of medical supplies and equipment to Shorabak for a fixed, total price of $764,823.95 ("Shorabak Contract"). (Plaintiff's Trial Exhibit ("Pl. Ex.") 20; N.T. 5/21/2018 at 41; N.T. 5/23/18 at 201-202.) In its proposal to the Government, KVG did not estimate or calculate its labor burden for the contract. (N.T. 5/21/18 at 56-57.)

On that same day, May 25, 2014, KVG and Target entered into a purchase agreement whereby KVG issued a purchase order to Target, as the subcontractor, for delivery of the items in KVG's Shorabak Contract with the Government, for a proposed payment of $678,534.84 to Target, with one group of items to be delivered by June 25, 2014, and the other group of items to be delivered by July 9, 2014.[2] (Pl. Ex. 19; N.T. 5/21/2018 at 45-47.) Under the purchase agreement, it was expressly stated, "All items new. Brand and Part Number exactly as Exhibits. KVG will verify prior to shipment." (Pl. Ex. 19.) The payment terms of the purchase agreement were "on payment" which meant that KVG was required to pay Target when KVG received payment from the Government. (Pl. Ex. 19; N.T. 5/21/2018 at 111-112; Ahmadi Trial Testimony ("A.T.") 3/4/2018 at 20-21.)

---

[2] No contract existed between the Government and Target regarding Shorabak.

The Shorabak Province was a combat environment at the time of the Shorabak Contract, with the Taliban operating on the road accessing the facility, making it difficult and dangerous to travel to and from Shorabak.  (N.T. 5/21/2018 at 58-59; A.T. 3/4/2018 at 34-35.) KVG and the Government were aware of the danger and the fact that as indigenous people helping US forces, Target personnel were putting themselves and their families at great risk of being killed or injured by the Taliban, and therefore had to proceed cautiously.  (Pl. Ex. 40; N.T. 5/21/2018 at 69-71; A.T. 3/4/2018 at 34-35 and 3/5/2018 at 161; N.T. 5/30/2018 at 40.)  While some shipments were on time, some deliveries of the items to Shorabak were repeatedly delayed. (N.T. 5/30/18 at 76.)  Target delivered items under the May 25, 2014 purchase agreement between June and September 2014.  (N.T. 5/21/2018 at 49.)

The Government contracting officer for Shorabak was Kari Pelton.[3]  (N.T. 5/30/18 at 54.)  Other representatives for the Government included the contracting officer's representative ("COR"), HM2 John Leverage;[4] Captain James P. Cole ("Captain Cole");[5] and Major John Greener ("Major Greener").[6]  (N.T. 5/30/2018 at 25-26.)

On June 23, 2014, Major Greener acknowledged delivery of some of the items, sending an email to Target owner, Yama Ahmadi,[7] saying "[t]he equipment did indeed turn up

---

[3]     Kari Pelton was not called to testify at trial, nor was any deposition testimony of her presented into evidence at trial.

[4]     John Leverage was an HM2, a hospital corpsman.  (N.T. 5/30/18 at 25-26.)

[5]     While in Afghanistan, Captain Cole, a Command Surgeon, was responsible for the development of Shorabak.  (N.T. 5/30/18 at 10.)

[6]     Major Greener, who served in the British Army, worked for Captain Cole, and was the lead officer to ensure development of Shorabak.  (N.T. 5/30/18 at 25-26.)

[7]     Yama Ahmadi has been identified as a partner and co-owner of Target since 2012.

and I was there to oversee it with Imdad Khan[8] and it is looking good." (Pl. Ex. 28.) On June 28, 2014, Major Greener sent an email to Mr. Ahmadi, saying "we have now had three deliveries and they have gone well. … There are a few items that require further attention as discussed (wheels for gurneys and ward beds) but otherwise the equipment seems in good order. I have discussed with Imdad that until everything is installed and tested I will not be signing off the delivery as complete. . . . All in all, I am happy with progress . . ." (Pl. Ex. 28.)

On July 16, 2014, Captain Cole sent Mr. Ahmadi an email saying he was "frustrated and disappointed" with the quality and timeliness of some of the items Target delivered, saying "I unequivocally need you to address these problems immediately. We need quality equipment delivered, we need all of the broken, used, and wrongly substituted equipment replaced immediately, and we need everything installed by the 19th." (Defendant's Trial Exhibit ("Def. Ex.") 102.) Captain Cole complained to Mr. Ahmadi that some of the items appeared to be used goods, and were bent, chipped, rusted, or broken. (Def. Ex 102; N.T. 5/30/2018 at 29-30, 93.) At trial, Captain Cole testified that the ventilators provided by Target were old; images had been burnt into monitors; operating room ceiling lights were not correct, and appeared to have been pulled out of other buildings; the equipment sterilizer was broken; and a few items had broken down just a few hours after use. (N.T. 5/30/18 at 24.)

On July 18, 2014, Ms. Pelton sent KVG an email regarding "serious issues related to the quality of products and services on the subject contract. … my office will be preparing a cure notice detailing KVG's deficiencies, which will ultimately reflect in KVG's past

---

[8]     Imdad Khan assisted Target with the deliveries on the Shorabak contract.  (N.T. 5/21/18 at 60-62; N.T. 5/23/18 at 8; N.T. 5/24/18 at 20, 91.)

performance if not corrected." (Def. Ex. 107.) Ms. Pelton notified John Boyer and Elisha Abbott of KVG[9] that a cure notice would be prepared and sent to KVG. (Def. Ex. 107; N.T. 5/24/18 at 54-55; N.T. 5/30/18 at 67-68.) This email was forwarded to Mr. Ahmadi, and Mr. Boyer expressed that the situation "needs to be corrected immediately," and directed him to "outline a clear plan to fix any identified discrepancies." (Def. Ex. 105; A.T. 3/4/18 at 173-175.)

On July 19, 2014, Captain Cole again expressed his frustration by email to Mr. Abbott about Mr. Ahmadi, restating that many of the items delivered by Target were used. (Def. Ex. 108; N.T. 5/30/18 at 49-51.) Captain Cole requested that Mr. Abbott come to Shorabak in order to see the issues that the Government was experiencing with the goods delivered. (Def. Ex. 108; N.T. 5/30/18 at 152.) Mr. Abbott flew to Kabul, Afghanistan on an emergency Visa to meet with Mr. Ahmadi shortly after he received the complaints about Shorabak. (N.T. 5/24/18 at 13.) During the visit, Mr. Abbott informed Mr. Ahmadi that all goods delivered to Shorabak had to be new and match the purchase order specifications. (N.T. 5/24/18 at 13-14.) Mr. Ahmadi assured Mr. Abbott that everything delivered would be correct. (Id.) Mr. Abbott was unable to travel to Shorabak because it was too dangerous. (N.T. 5/24/18 at 13.)

On July 22, 2014, the Government, through Ms. Pelton, informed KVG by letter that KVG was in breach of its contract with the Government. (Def. Ex. 119.) In the cure notice, the Government offered to extend the delivery deadline for KVG to perform, and negotiate a discount on the contract. (Id.) On that same date, Mr. Ahmadi was informed of the Shorabak cure notice. (Def. Ex. 110; N.T. 5/24/18 at 17.)

---

[9]     KVG was formed by John Boyer ("Mr. Boyer"), Mr. Boyer's father, and Elisha Abbott ("Mr. Abbott") in 2013 to handle logistics and procurement. Prior to forming KVG, both Mr. Boyer and Mr. Abbott had previously served in the United States Marine Corps.

6

On July 23, 2014, Major Greener emailed Mr. Ahmadi, copying Mr. Abbott, saying "[w]e have now received approximately 94% of all the equipment." Describing certain equipment as used or broken, Major Greener stated that "we will accept the equipment but discuss options open to us. … the equipment has been delivered, installed and is currently being tested ahead of training, it has been far from efficient and well managed." (Pl. Ex. 45.) Captain Cole confirmed these statements to be accurate. (N.T. 5/30/2018 at 158-159.)

On July 25, 2014, Major Greener sent Mr. Ahmadi a list of "the few additional issues that will need resolution." (Pl. Ex. 45.) On July 26, 2014, Mr. Ahmadi provided a line-by-line response to the issues identified by Major Greener. (Id.) On August 2, 2014 Major Greener sent Mr. Ahmadi a list of "issues from today's inspection," identifying three items and listing their discrepancies. (Def. Ex. 114.) That same day, Captain Cole followed up Major Greener's email explaining how he discovered that a ventilator did not work, expressing that had it been used, a patient could have died. (Id.; N.T. 5/30/18 at 43-44.) These emails did not direct or request further action by Target. (Def. Ex. 114.)

During the course of the Shorabak contract, the Government requested that Target replace some of the items delivered. (Def. Ex. 115; N.T. 5/21/2018 at 56.) Target's representative, "genuinely tried to help [the Government] rectify [their] problems." (Pl. Ex. 74; N.T. 5/30/2018 at 175-176.) In fact, in a letter dated September 23, 2014, Captain Cole stated that "Imdad replaced the damaged items, arranged for modification of electronically incompatible items, and did his very best to rectify all problems noted." (Id.)

Captain Cole commented that some items were replaced, but if items could not be replaced, the Government would "modify them, paint them, bend them," etc. (N.T. 5/30/2018 at

25, 36.)  The Government either exchanged, kept, used, or modified the items that Target delivered.  (N.T. 5/30/2018 at 24-25, 36, 165-166.)

Captain Cole recognized the difficulty of acquiring goods and supplies in Afghanistan, as did KVG. (Pl. Ex. 43; N.T. 5/30/2018 at 156.)  According to Mr. Abbott, "[t]here are a myriad of issues that make these difficult in Afghanistan. Poor initial storage conditions and rough transportation and checkpoint inspections are often responsible for damages," and security issues frustrated the timeline.  (Pl. Ex. 43; N.T. 5/21/18 at 69-72.)

Ultimately, Captain Cole testified that they worked together to ensure that items were fixed and working because the Government was going to be pulling out of Afghanistan. (N.T. 5/30/2018 at 20-21.)  Despite some delays,[10] Shorabak was a "functioning trauma center" that "worked very well" and "served its purpose" when U.S. and British forces departed the trauma center.  (N.T. 5/30/2018 at 19-20; 145.)  Captain Cole confirmed that as of October 18, 2014, all of the equipment and supplies that Target delivered, whether it was with the original shipment or sent as a replacement, was being used at the trauma center.  (N.T. 5/30/18 at 165-166.)

KVG and the Government modified the May 25, 2014 contract to provide the Government with a five percent discount on the entire contract.  (Pl. Ex. 65; N.T. 5/21/2018 at 100-101.)  On August 29, 2014, KVG sent the Government an invoice with an itemized breakdown of the items Target delivered to Shorabak, in the amount of $726,582.75, reflecting the negotiated five percent discount, which was a reduction of $38,241.20 on the contract.  (Pl.

---

[10] Captain Cole testified that Shorabak was difficult to complete.  Timelines were repeatedly not met, equipment was delivered in disrepair, and Mr. Ahmadi was difficult to get in touch with.  (N.T. 5/30/18 at 18.)

Ex. 58; N.T. 5/21/2018 99-100.)  KVG did not seek or obtain approval from Target with respect to any negotiations regarding the discount or the modification of the contract.  (N.T. 5/21/2018 at 160.)

On September 14, 2014, Target sent, and KVG received, an invoice for the amount in the purchase agreement of $678,534.84, along with the signed delivery tickets for the items listed in the purchase agreement.  (Pl. Ex. 66; N.T. 5/21/2018 at 109; 111.)

On September 23, 2014, Captain Cole sent a letter to Mr. Ahmadi, on Department of Defense letterhead, stating that Target's representative, Imdad Khan, "was instrumental in delivering all of the Shorabak Trauma Center equipment and rectifying the problems and discrepancies identified."  (Pl. Ex. 74; N.T. 5/30/2018 at 175-176.)  Captain Cole also stated that "[d]espite many discrepancies noted after delivery of many items had been damaged in transit to Camp Shorabak, Imdad replaced the damaged items, arranged for modification of electrically incompatible items, and did his very best to rectify all problems noted."  (Id.)

A Form DD250 ("DD250") is a standard Department of Defense form that the Government uses as a mechanism to accept goods on a contract.  (Def. Ex. 146; N.T. 5/21/2018 at 65-66; N.T. 5/23/18 at 187.)  A DD250 signed by an authorized individual in the Government is required to trigger payment to a contractor.  (N.T. 5/21/2018 at 170; N.T. 5/24/2018 at 69-70, 73.)  The terms of the Shorabak Contract required that a DD250 be prepared.  (Pl. Ex. 20; N.T. 5/23/18 at 203-204.)  The signature box on the standard DD250 form has a check box that says "Acceptance of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents."  (Def. Ex. 164; N.T. 5/21/2018 at 105.)  Although KVG maintains that they do not have a copy of the DD250 for the Shorabak

Contract, there is no dispute that the Government signed a DD250 for the Shorabak Contract.[11] (N.T. 5/21/2018 at 65-66; 104; N.T. 5/23/18 at 197; N.T. 5/24/2018 at 76-77.)

On September 24, 2014, the Government paid KVG $726,582.75, or 95 percent of the Shorabak Contract price, thereby closing out the contract. (Pl. Ex. 76; N.T. 5/21/2018 at 49, 103; N.T. 5/23/18 at 249-250.) KVG deposited the money from the Government into its operating account. (N.T. 5/21/2018 at 161.) KVG did not pay Target any amount for the Shorabak Contract. (N.T. 5/21/2018 at 188.)

## II. Paktiya Contract

The U.S. Government sought to expand the inpatient capability of Paktiya Regional Military Hospital ("Paktiya") in Afghanistan from 50 to 100 beds, in anticipation of the withdrawal of U.S. Forces from the Province and elsewhere within Regional Command-East. (N.T. 5/30/18 at 84.) The Paktiya medical expansion was to be completed pursuant to a contract between the U.S. Government and KVG. (N.T. 5/30/18 at 85.) In its proposal to the Government, KVG did not estimate or calculate its labor burden for the contract. (N.T. 5/21/18 at 149-151.) KVG was awarded the contract to provide goods to Paktiya. The amount of the contract was $201,967.60. (Pl. Ex. 12; Def. Ex. 137; N.T. 5/24/18 at 55.)

On June 15, 2014, KVG and Target entered into a purchase agreement whereby KVG issued a purchase order to Target for delivery of the medical supplies and equipment to Paktiya in accordance with KVG's contract with the Government, for a proposed payment of $179,136.48 ("Paktiya Contract"). (Pl. Ex. 26, 27; Def. Ex. 139; N.T. 5/21/2018 at 112-113.)

---

[11] No completed DD250 was submitted to the Court in connection with the Shorabak Contract. The parties, however, acknowledged that a DD250 would have had to have been prepared in order for KVG to be paid by the Government.

Under the contract, Target was required to deliver, according to brand and model where specified, seventy items. The KVG purchase order to Target for Paktiya required "All items new. BRAND and Part Number exactly as Exhibit. KVG will verify prior to delivery." (Def. Ex. 139; N.T. 5/24/18 at 56.) The scheduled delivery date for goods to Paktiya was August 12, 2014. (Pl. Ex. 27; Def. Ex. 139; N.T. 5/21/18 at 113.) Target was not able to meet the delivery deadline under the contract. (N.T. 5/21/18 at 113-114.) Target made deliveries of medical equipment and supplies directly to Paktiya on August 19, 2014 and September 19, 2014.

The Government contracting officer for Paktiya was Kari Pelton and the acting COR was Captain Katherine Zamperini ("Captain Zamperini").[12] (N.T. 5/30/18 at 85-86.) Captain Zamperini was tasked with receiving the supplies and equipment from Target and inspecting the items against the contract requirements for any discrepancies. (N.T. 5/30/2018 at 85-86.)

After the first delivery, Captain Zamperini contacted Mr. Ahmadi, "expressing concern" about nonconforming items. (N.T. 5/30/2018 at 98.) On August 19, 2014, Captain Zamperini sent an email to Mr. Ahmadi with a list of several complaints about Target's delivery of goods to Paktiya. (Def. Ex. 142.) Mr. Ahmadi made some suggestions that he could provide similar products to the ones contractually ordered. (Def. Ex. 142.) In response, Captain Zamperini advised that the equipment must match what is stated in the contract. (Id.) She furthered noted that if the equipment did not match, "it will be annotated and the contract will be adjusted pricewise." (Id.) With Target's first delivery of goods to Paktiya, thirty-seven out of

---

[12] Captain Zamperini, a medical doctor, became the medical advisor to Paktiya in July 2014. (N.T. 5/30/18 81, 84.)

seventy items were incorrect, damaged, or missing.  (N.T. 5/30/18 at 98; Def. Ex. 146.)

Captain Zamperini notified Ms. Pelton regarding the nonconforming goods.  (Def. Ex. 146; N.T. 5/30/18 at 109-110, 114.)  Ms. Pelton instructed Captain Zamperini to indicate in an excel spreadsheet which items the Government would keep, reject, or request Target replace. (Def. Ex. 146.)  Ms. Pelton further instructed Captain Zamperini that "if you want [Target] to replace the item then the [Government] should not accept or pay for the item until it is satisfactory. You can also just reject/cancel the item and have them take whatever they brought back with them."  (Def. Ex. 146.)  Captain Zamperini used a color-coded spreadsheet of item discrepancies on the Paktiya contract, with green indicating that the correct contract item had been delivered; yellow indicating that the Government needed to verify the item; and red indicating that the item needed to be replaced. (Pl. Ex. 59; N.T. 5/21/2018 at 117-118; N.T. 5/30/2018 at 132-133.)  At trial, this spreadsheet was admitted into evidence.  (Pl. Ex. 59.) According to the spreadsheet, there were only three items color coded in red on the chart, and the rest were yellow or green.  (Pl. Ex. 59; N.T. 5/30/2018 at 133-134.)

The record demonstrates that Mr. Ahmadi did replace some of the goods initially delivered with conforming items.  (N.T. 5/30/18 at 98.)  According to Captain Zamperini, Mr. Ahmadi made multiple attempts to fix discrepancies, but at the end of the process there were still some items that were incorrect and damaged.  (N.T. 5/30/18 at 114.)  If certain pieces of equipment were nonconforming, but were still functional and useful in the hospital, then the Government would decide whether to accept the nonconforming item in place of the item listed in the contract.  (N.T. 5/30/2018 at 94.)  The Government only accepted nonconforming goods if they were still useful to the Afghan Army.  (N.T. 5/30/2018 at 129-130, 132.)  Neither the

Government, nor KVG, returned the goods delivered, or abandoned them.  (Stipulated Finding of Fact.)

On September 19, 2014, Captain Zamperini informed Mr. Ahmadi by email that the contract was "being adjusted according to the items delivered."  (Pl. Ex. 69.)  Mr. Ahmadi thought that this message referred to two surgery lights that had been delivered, but were unable to be installed in the ceiling.  (A.T. 3/4/18 at 72-73.)  Mr. Ahmadi did not hear anything further from Captain Zamperini.  (A.T. 3/4/2018 at 73.)

On September 20, 2014, KVG sent an invoice for the Paktiya Contract to the Government in the amount of $138,447.86, reflecting a negotiated discount, a reduction of $63,519.74 on the contract.  (Pl. Ex. 73; N.T. 5/21/2018 at 128.)  KVG did not contemporaneously track time it spent on the contract.  (N.T. 5/23/18 at 221.)  The discount was reached based on the spreadsheet exchanged between the Government and KVG.  (N.T. 5/24/2018 at 97.)  KVG did not seek or obtain approval from Target with respect to any negotiations regarding the discount or the modification of the contract.  (N.T. 5/21/2018 at 160.)

Ms. Pelton had informed Captain Zamperini that "[t]he DD250 is the internal gov't document showing which items that correlate to the contract the gov't is accepting. The primecontractor will likely pre-fill most of the DD250 and email that to you", which Mr. Boyer agrees would have occurred for this contract.  (Def. Ex. 147.)  Although KVG maintains that they do not have a copy of the DD250 for the Paktiya Contract, there is no dispute that the Government signed a DD250 for the Paktiya Contract.[13]  (N.T. 5/21/2018 at 128-129, 150, 170;

---

[13]    No completed DD250 was submitted to the Court in connection with the Paktiya Contract.  The parties, however, acknowledged that a DD250 would have had to have been prepared in order for KVG to be paid by the Government.  As Mr. Abbott testified, "I will agree that a DD250 exists for sure back in Paktia [sic], signed by

N.T. 5/23/18 at 186-187, 197; N.T. 5/24/2018 at 76-77.)

On October 14, 2014, KVG received payment from the Government for the Paktiya Contract in the amount of $138,447.86, constituting approximately 69 percent of the contract price. (N.T. 79B; N.T. 5/21/2018 at 124; N.T. 5/23/18 at 249-250.) On October 27, 2014, Target invoiced KVG for the goods that Target delivered to Paktiya. (Pl. Ex. 79A; N.T. 5/21/2018 at 123-124; A.T. 3/4/2018 at 69.) KVG did not pay Target any amount for the Paktiya Contract. (N.T. 5/21/2018 at 188; A.T. 3/4/2018 at 66, 69, 73, 196.)

### III. Withheld Payment on the Shorabak and Paktiya Contracts

In late 2014, Mr. Ahmadi asked Mr. Abbott whether there was any update regarding payment on the Shorabak and Paktiya contracts. (Pl. Ex. 80.) Mr. Abbott, choosing not to disclose that KVG had already received payment from the Government, instead responded that he was "[w]orking on it," and "no date yet, you know how it goes" in response to Mr. Ahmadi's pleas for payment owed to his suppliers. (Pl. Ex. 80; N.T. 5/21/2018 at 26-27, 29-30; A.T. 3/4/2018 at 51, 53, 55-56, 59-61.)

Mr. Ahmadi understood Mr. Abbott's statement that he was "working on it" to mean that KVG was working on getting payment from the Government. (Pl. Ex. 80; A.T. 3/4/2018 at 55, 59-60.) However, Mr. Abbott testified that when he said "working on it," he meant that he was working on determining what, and if, KVG was going to pay Target; a fact that he did not disclose to Mr. Ahmadi. (Pl. Ex. 80; N.T. 5/21/2018 at 29.)

---

the … contracting officer." (N.T. 5/24/18 at 76-77.)

On October 15, 2014, Mr. Ahmadi requested payment of the invoice he submitted to KVG for the Shorabak Contract. (Pl. Ex. 76; N.T. 5/21/2018 at 50-51.) Mr. Abbott responded that "[w]e are still working on the payment process" and, again, did not tell Mr. Ahmadi that KVG had already received payment from the Government. (Pl. Ex. 76; N.T. 5/21/2018 at 51-53.)

In November 2014, Mr. Ahmadi contacted Mr. Abbott several times, requesting evidence that the Government was withholding payment to KVG so that he could show his suppliers who were demanding payment or an explanation. (Pl. Ex. 80-81; N.T. 5/21/2018 at 136-137.) In response, Mr. Abbott did not provide Target any email communication with the Government about payment, and did not tell Mr. Ahmadi that KVG had already been paid by the Government. (A.T. 3/4/2018 at 76-77, 78-79.)

In December 2014, Mr. Abbott told Mr. Ahmadi that "the contract is under review" and that "the payments are [on] hold due to a problem," and later that "[w]ith the US holidays now starting, we expect no further progress until the middle of January. We will keep you updated as to any further requests at that time." (Pl. Ex. 81; N.T. 5/21/2018 at 135.) Mr. Abbott did not tell Mr. Ahmadi that KVG was the one holding the money. (N.T. 5/21/2018 at 135-136.)

In February 2015, and several times again in March 2015, Mr. Ahmadi inquired about payment, noting that Target was in "big trouble" regarding payment, to which Mr. Abbott continued to respond that "the narrative is still in process," "update will be coming soon," and "things are moving slowly and still under review," never telling Target that they had already received payment. (Pl. Ex. 82; N.T. 5/21/2018 at 135, 142-144; A.T. 3/4/2018 at 80.) By March

3, 2015, KVG had decided that it was not going to pay Target, claiming it did not know what was delivered to Paktiya and Shorabak.  (N.T. 5/21/2018 at 142; N.T. 5/24/2018 at 118.)

On March 20, 2015, KVG sent a letter, drafted by a lawyer in the Philippines, to Target stating that KVG would be holding payment on the Shorabak and Paktiya Contracts, totaling $857,671.32 for two years pending resolution or any adverse action by the government on either contract.  (Pl. Ex. 83; N.T. 5/21/2018 at 142-143, 145.)  KVG withheld payment on the premise that it was at risk for adverse action from the Special Inspector General for Afghanistan Reconstruction ("SIGAR"),[14] the Government, or the Government of Afghanistan. (N.T. 5/21/2018 at 156, 183.)  In sum, Mr. Abbott testified that payments were withheld to Target because KVG did not know what goods were actually delivered,[15] and it was concerned that SIGAR was opening investigations into poor performance on Government contracts pertaining to Afghanistan.  (N.T. 5/21/18 at 156.)  At trial, however, Mr. Abbott testified that he was never made aware of any SIGAR investigations of KVG relating to Target, or any CID investigations, False Claims Act cases, proposed debarment, suspension, or requests for more money against KVG, and KVG is confident that such adverse action will no longer occur.  (N.T. 5/21/2018 at 156-157, 188.)

---

[14]     SIGAR is a Congressionally created agency within the U.S. Departments of State and Defense. (N.T. 5/21/18 at 173.)  SIGAR conducts investigations to uncover waste, fraud and abuse as it relates to government contracts in Afghanistan.  (Id.)

[15]     The March 20, 2015 letter did not request that Target provide proof of the authenticity of the items delivered on the contracts, or request clarification of documents that Target had provided previously.  (Pl. Ex. 83; N.T. 5/21/2018 at 183; N.T. 5/23/18 at 230-231.)  KVG did not follow up at any point after the March 20, 2015 letter (until after this lawsuit was filed) to request that Target provide proof of the items delivered.  (N.T. 5/21/2018 at 183.)

The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that the Government had not been withholding payment, and that KVG was considering seeking damages against Target for several of the parties' contracts. (N.T. 5/21/2018 at 144, 146-148.) At no point prior to March 20, 2015, did KVG, on any of the parties' contracts, request that Target take any items back, or state that it would be seeking damages from Target. (N.T. 5/21/2018 at 149.)

After 2015, KVG did not receive any more solicitations for work in Afghanistan and it did not seek any solicitations. (N.T. 5/23/18 at 145-146, 238.) KVG avers that it was put out of business in Afghanistan as a result of all of Target's mistakes. (Id.)

## IV. Counterclaims

### A. Bagram Flagpole

On April 3, 2013, Target and KVG entered into a contract for the purchase and delivery of a 25-foot flagpole to the Government at Bagram Air Base. (N.T. 5/23/8 at 85, 92-93.) In its proposal to the Government, KVG did not estimate or calculate its labor burden for the contract. (N.T. 5/21/18 at 149-151.)

On or about April 22, 2013, Target delivered an 18-foot-tall flagpole to the Government at Bagram Air Base. (Def. Ex. 56.) On that same day, the Government acknowledged receipt of the flagpole that Target had delivered, noting that it "was not the item quoted. The delivered pole is just shy of 18ft, and is missing some of the features from your quote." (Id.) Mr. Abbott relayed the Government's email to Target and requested that Target "let [him] know when the correct flagpole is ready for delivery." (Id.)

Target replaced the 18-foot flagpole with a 25-foot flagpole that was consistent with the contract specifications. (Def. Ex. 56; N.T. 5/23/18 at 95, 98-99; N.T. 5/24/18 at 82, 133.) The replacement flagpole from Target was acceptable to the Government and KVG. (N.T. 5/23/18 at 87; N.T. 5/24/18 82.)

The Government paid KVG for the flagpole Target delivered, and the Government retained possession of the replacement flagpole. (N.T. 5/21/18 at 158-159; N.T. 5/23/18 at 219; N.T. 5/24/18 at 134.) KVG paid Target for the flagpole it had delivered to Bagram Air Base, and the contract was closed out in 2013. (N.T. 5/21/18 at 148-149; 5/24/18 at 82, 113, 134.) There is no indication in the record that the Government returned the replacement flagpole that Target delivered. (N.T. 5/21/2018 at 158-159.)

KVG did not make any further mention with respect to the 25-foot flagpole delivered by Target to Bagram Air Base until March 20, 2015, approximately 23 months after the flagpole had been delivered, and accepted by the Government and KVG. (N.T. 5/21/18 at 146.) The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the flagpole to Bagram Air Base. (N.T. 5/21/2018 at 146-148.) During his testimony at trial, Mr. Abbott confirmed that at no point between 2013 and March 2015 did KVG tell Target that KVG was revoking its acceptance of the flagpole, returning the flagpole, or seeking damages. (N.T. 5/21/18 at 149.)

KVG alleges that it suffered $2,000 (20 hours x $100/hr) in compensatory damages in addressing the nonconforming flagpole. (N.T. 5/24/18 at 61; Def. Ex. 185.) KVG, however, did not contemporaneously track time it spent on this contract. (N.T. 5/23/18 at 221;

N.T. 5/24/18 at 85.)  In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any issues with this contract until after this case was filed.  (N.T. 5/24/18 at 85-87; N.T. 5/23/18 at 221.)

    B. <u>Shindad Tent Skin</u>

KVG executed a contract with the Government on June 14, 2013 for a PVC tent roof cover, or "tent skin."  (Def. Ex. 60; N.T. 5/24/18 at 29.)  In its proposal to the Government, KVG did not estimate or calculate its labor burden for the contract.  (N.T. 5/21/18 at 149-151.)

On June 13, 2013, Target and KVG entered into an agreement for the purchase and delivery of a tent skin to Shindand Air Base[16] for $31,000, under KVG's contract with the Government, Contract No. W56JSM-13-P-0116.  (Def. Ex. 60, 68; A.T. 3/5/2018 43; N.T. 5/24/2018 27-29.)  The tent skin was to be fire retardant, water proof, and manufactured by Al Baddad International, Dubai, UAE.  (Def. Ex. 68; 5/24/18 at 29.)

On August 5, 2013, Target made a delivery to the Government at Shindand Air Base.  (Def. Ex. 80.)  The Government acknowledged receipt of the goods that Target had delivered, but noted that although the tent skin should have been in one piece, it came in several boxes. (Def. Ex. 80.)  Mr. Boyer explained that Mr. Ahmadi acknowledged that the tent skin delivered by Target was not the Al Baddad tent skin ordered.  (N.T. 5/24/18 at 40.)  Mr. Ahmadi blamed this mistake on his supplier.  (A.T. 3/5/18 at 62.)

In order to fix the delivery of this nonconforming item, Mr. Abbott flew to Dubai and met with Mr. Ahmadi in order to oversee the purchase of the correct tent skin.  (N.T. 5/24/18 at 42.)  KVG paid for the transport of the correct item, as well as the plane ticket to Dubai.  (N.T.

---

[16]    The Shindand Air Base is located in the Herat Province, Afghanistan.

5/24/18 at 42; Def. Ex. 85.)  The cost of the plane ticket to Dubai was $538.03.  (Def. Ex. 85.)

KVG walked Target through the entire process of obtaining the correct tent skin.  (A.T. 3/5/18 at

69.)

On August 29, 2013, Target delivered a replacement tent skin to the Government

at Shindand Air Base.  (A.T. 3/5/2018 at 156, 159.)  The tent skin delivered to the Government

on August 29, 2013 was the correct item, and the Government accepted the tent skin.  (A.T.

3/5/18 82, 156, 159.)  There is no indication in the record that the Government returned the

replacement tent skin that was delivered on August 29, 2013.

The Government paid KVG for the tent skin Target delivered, and the

Government retained possession of the replacement tent skin.  (N.T. 5/23/18 at 219; N.T. 5/24/18

at 134; A.T. 3/5/18 at 86.)  On September 24, 2013, Target invoiced KVG for the tent skin it

delivered to Shindand Air Base.  (Def. Ex. 87; A.T. 3/5/2018 at 82.)  KVG paid Target for the

tent skin it delivered to Shindand Air Base, and the contract was closed out in 2013.  (N.T.

5/21/18 at 148-149; N.T. 5/24/18 at 134; A.T. 3/5/2018 at 82, 156-157.)

KVG listed the contract as an example of a contract completed to the satisfaction

of the Government, and as an example of past contract performance by both KVG and Target in a

subsequent May 11, 2014 technical factor, and again in another proposal.  (Pl. Ex. 15; Def. Ex.

175; N.T. 5/23/18 at 212-214.)  This example formed part of the proposal packages submitted to

the Government when KVG was seeking other contracts.  (Id.)

KVG did not make any further mention with respect to the tent skin until March

20, 2015, approximately 19 months after it had been delivered to the Government.  (N.T. 5/21/18

at 146-147.)  The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was

considering seeking damages against Target for several of the parties' contracts, including the delivery of the tent skin. (N.T. 5/21/2018 at 146-148.) During his testimony at trial, Mr. Abbott confirmed that at no point between 2013 and March 2015 did KVG give notice to Target that it was revoking acceptance of the tent skin, returning the tent skin, or seeking damages. (N.T. 5/21/18 at 149.)

KVG alleges that it suffered $13,600 (136 hours x $100/hr) in compensatory damages in addressing the nonconforming tent skin. (N.T. 5/24/18 at 61; Def. Ex. 185.) KVG, however, did not contemporaneously track time it spent on this contract. (N.T. 5/23/18 at 221; N.T. 5/24/18 at 85.) In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any issues with this contract until after this case was filed. (N.T. 5/24/18 at 85-87; N.T. 5/23/18 at 221.) KVG also alleges that it spent $9,600 to another freight forwarder in order to deliver the correct tent skin.[17] (Def. Ex. 185; N.T. 5/24/18 at 61.) In addition, KVG asserts that it lost an additional contract with the U.S. Government because of the tent skin contract, which resulted in lost profits of $32,643. (Def. Ex. 185; N.T. 5/24/18 at 62.)

C. Pilot Armor Vests and Plates

In October 2013, Target and KVG entered into an agreement for the purchase and delivery of pilot armor vests to the Afghan Pilot program at Kabul International Airport. (Dkt. No. 222 - Stipulated Finding of Fact No. 14.) In its proposal to the Government, KVG did not estimate or calculate its labor burden for the contract. (N.T. 5/21/18 at 149-151.)

---

[17] No transport receipt was submitted to the Court.

Byron Kreck ("Mr. Kreck") testified at trial. (N.T. 5/23/18.) Mr. Kreck served in the United States Army from 1989 to 2009, and worked for Raytheon Co. ("Raytheon") from October 2013 until May 2016. (N.T. 5/23/18 at 14-15, 18.) As part of his work for Raytheon, he was tasked with procuring protective vests for Afghan National Army pilots. (N.T. 5/23/18 at 22.) KVG was retained to provide the vests to Raytheon. KVG, in turn, subcontracted the project to Target. (N.T. 5/23/18 at 24-25; Def. Ex. 150.)

On October 27, 2013, Target provided a sample of the vests to Mr. Kreck for inspection. (N.T. 5/23/18 at 27.) Mr. Kreck found the samples to be of appropriate quality, and he photographed the sample plate. (N.T. 5/23/18 at 27, 29; Def. Ex. 151 (Bates 2101), 154.) The manufacturer of the sample plate was Global Armour, South Africa, and the plate was ceramic. (N.T. 5/23/18 at 30, Def. Ex. 151 (Bates 2101, 2083).)

On November 15, 2013, Target delivered plates and vests. (N.T. 5/23/18 at 31-32; Def. Ex. 151 (Bates 2085).) Mr. Kreck testified that the armor plates delivered were not made of ceramic, and were completely different from the sample shown previously. (N.T. 5/23/18 at 33, 34.) The plates delivered had numerous defects, including rips, tears, dirt, stains and were not properly labeled. (N.T. 5/23/18 at 34.) In addition, the vests delivered had no sizes labeled, and appeared to be all the same size, as opposed to the various sizes ordered. (N.T. 5/23/18 at 36, 37.) These discrepancies were reported to KVG, and Mr. Boyer advised that he would send out the vendor [Target] to replace the vests. (N.T. 5/23/18 at 34, 36-37, Def. Ex. 156 (Bates 2135-2136).) On November 15, 2013, Mr. Boyer notified Mr. Ahmadi of the nonconforming plates and vests. (N.T. 5/23/18 at 101; Def. Ex. 155.) In his communication, Mr. Boyer requested that Mr. Ahmadi retrieve the nonconforming goods and replace them. (Def. Ex.

155.)

Target delivered a replacement set of armored vests on or about December 2, 2013. (N.T. 5/23/18 at 38.) Mr. Kreck wrote an email identifying various deficiencies with the second shipment of goods. (N.T. 5/23/18 at 43; Def. Ex. 157.) Mr. Kreck commented that the vests in the second shipment seemed sufficient, but the armor plates appeared homemade. (Id.) The manufacturer name, Global Armour, did not appear on the plates delivered in the second shipment. (N.T. 5/23/18 at 40.)

A third delivery was received on or about December 6, 2013. (N.T. 5/23/18 at 44.) The plates delivered in the third shipment contained the wrong manufacturer name, no manufacturing date, no serial number, and no lot number. (N.T. 5/23/18 at 46, Def Ex. 151 (Bates 2077-2078).) Mr. Kreck emailed KVG concerning the deficiencies, (N.T. 5/23/18 at 49-50; Def. Ex. 157, 158.) Target made three deliveries of armored plates that were not accepted. (N.T. 5/23/18 at 50.) Acceptable plates were finally provided, but not from Target. (N.T. 5/23/18 at 50.)

The Government paid KVG for the armor vests that Target delivered, and the Government retained possession of the replacement armor vests. (N.T. 5/21/18 at 158-159; 5/24/18 at 134; A.T. 3/5/18 at 160.) KVG paid Target for the vests it delivered, but Target was not paid for any armor plates that were delivered. (5/24/18 at 134, 157; A.T. 3/5/18 at 159-160.) The armor plates that were delivered by Target, were taken back by Target, and placed back into Target's stock. (A.T. 3/5/18 at 159.) The contract was closed out as of January 29, 2014. (N.T. 5/24/18 at 134.) KVG did not make any further mention with respect to the armored vests until March 20, 2015, more than 14 months after KVG paid Target for the vests. (N.T. 5/21/18 at

146-147.) The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the armor vests. (N.T. 5/21/2018 at 146-148.)

KVG alleges that it suffered $12,000 (120 hours x $100/hr) in compensatory damages in addressing the nonconforming armor vests. (N.T. 5/24/18 at 62; Def. Ex. 185.) KVG, however, did not contemporaneously track time it spent on this contract. (N.T. 5/23/18 at 221; N.T. 5/24/18 at 85.) In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any issues with this contract until after this case was filed. (N.T. 5/24/18 at 85-87; N.T. 5/23/18 at 221.) KVG also alleges that if it had not taken charge and provided the correct plates, KVG could have received a negative report from the Government. (N.T. 5/23/18 at 53.)

D. Bagram DFIP Medical Equipment

On August 15, 2013, Target and KVG entered into an agreement for the purchase and delivery of VertX and XRay medical equipment to Bagram Air Base under KVG's contract with the Government, Contract No. W56JSM-13-P-0119. (Dkt. No. 222 - Stipulated Finding of Fact No. 11.) The contract provided that "[a]ll equipments are [sic] match with Same Model & Part Number." (Id.) After receipt of the contract award on July 19, 2013, KVG reiterated the necessity of exact part numbers being delivered correctly. (Id.)

On December 5, 2013, the Government acknowledged receipt of the medical equipment under this contract, and retained the delivered goods. (Dkt. No. 222 - Stipulated Finding of Fact No. 12; Def. Ex. 164; N.T. 5/24/18 at 133.) The Government signed the DD250 and there is no indication in the record that the Government or KVG returned, or attempted to

return, the medical equipment delivered. (Dkt. No. 222 - Stipulated Finding of Fact No. 13; Def. Ex. 164; A.T. 3/5/2018 at 160.)

The Government paid KVG for the medical equipment. (Dkt. No. 222 - Stipulated Finding of Fact No. 13; N.T. 5/24/18 at 134.) KVG paid Target for the medical equipment. (Dkt. No. 222 - Stipulated Finding of Fact No. 13; N.T. 5/23/18 at 219; N.T. 5/24/18 at 113, 134.) The contract was closed out in 2013. (N.T. 5/21/18 at 148-149

KVG listed the contract as an example of a contract completed to the satisfaction of the Government, and as an example of past contract performance by both KVG and Target in a subsequent May 11, 2014 technical factor, and again in another proposal. (Pl. Ex. 15; Def. Ex. 175; N.T. 5/23/18 at 212-214.) This example formed part of the proposal packages submitted to the Government when KVG was seeking other contracts. (Id.)

KVG did not make any further mention with respect to the Bagram DFIP medical equipment until March 20, 2015, approximately 15 months after it had been delivered to the Government, and more than 14 months after KVG paid Target for it. (N.T. 5/21/18 at 146-147.) The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the Bagram DFIP medical equipment. (N.T. 5/21/2018 at 146-148.) During his testimony at trial, Mr. Abbott confirmed that at no point between 2013 and March 2015 did KVG give notice to Target that it was revoking acceptance of the medical equipment, returning the medical equipment, or seeking damages. (N.T. 5/21/18 at 149.)

During trial, Mr. Boyer testified that Target failed to procure two items in this contract. (N.T. 5/24/18 at 43.) KVG asserts that it had to locate those items in the United States,

and supply them directly to the Government.  (Id.)  KVG avers that it suffered $43,084 in

damages because it had to pay for parts that Target could not deliver, but had previously quoted

to KVG.[18]  (N.T. 5/24/18 at 62; Def. Ex. 185.)  KVG further alleges that it suffered $10,400 (104

hours x $100/hr) in compensatory damages with respect to this contract.  (N.T. 5/24/18 at 61;

Def. Ex. 185.)  KVG, however, did not contemporaneously track time it spent on this contract.

(N.T. 5/23/18 at 221; N.T. 5/24/18 at 85.)  In fact, the record indicates that KVG did not even

calculate the amount of time spent (or the value thereof) addressing any issues with this contract

until after this case was filed.  (N.T. 5/24/18 at 85-87; N.T. 5/23/18 at 221.)

    E.  <u>Afghan National Defense University Sports Equipment</u>

       On August 28, 2013, Target and KVG entered into an agreement for the purchase

and delivery of sports equipment to the Afghan National Defense University under KVG's

contract with the Government, Contract No. W56JSM-13-P-1031.  (Dkt. No. 222 - Stipulated

Finding of Fact No. 15.)  The invoice price was $64,550, representing the quoted prices by

Target on July 18, 2013.  (Dkt. No. 222 - Stipulated Finding of Fact No. 16.)

       In December 2013, Target delivered sports equipment to Afghan National

Defense University.  (N.T. 5/24/18 at 133.)  On December 15, 2013, the Government

acknowledged receipt of the sports equipment under this contract, retained the goods, and paid

KVG in full.  (Dkt. No. 222 - Stipulated Finding of Fact No. 17; N.T. 5/21/18 at 149; N.T.

5/24/18 at 134; N.T. 5/23/18 at 219.)  KVG paid Target for the sports equipment it delivered, and

the contract was closed out in 2013. (Dkt. No. 222; Stipulated Finding of Fact No. 18; N.T.

5/21/18 at 148-149; N.T. 5/24/18 at 134.)  Despite having made payment, KVG averred at trial

---

[18]     There is no supporting documentation in the record, only the testimony of Mr. Abbott.

that nonconforming items were delivered. (N.T. 5/24/18 at 63.) However, neither the Government nor KVG returned the supplied sports equipment that Target delivered. (Dkt. No. 222 - Stipulated Finding of Fact No. 19.)

KVG listed the contract as an example of a contract completed to the satisfaction of the Government, and as an example of past contract performance by both KVG and Target in a subsequent May 11, 2014 technical factor, and again in another proposal. (Pl. Ex. 15; Def. Ex. 175; N.T. 5/23/18 at 212-214.) This example formed part of the proposal packages submitted to the Government when KVG was seeking other contracts. (Id.)

KVG did not make any further mention with respect to the sports equipment until March 20, 2015, more than 15 months after it had been delivered to the Government. (N.T. 5/21/18 at 146-147.) The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the sports equipment. (N.T. 5/21/2018 at 146-148.) During his testimony at trial, Mr. Abbott confirmed that at no point between 2013 and March 2015 did KVG give notice to Target that it was revoking acceptance of the sports equipment, returning the sports equipment, or seeking damages. (N.T. 5/21/18 at 149.)

KVG alleges that it suffered $14,400 (144 hours x $100/hr) in compensatory damages in addressing this contract. (N.T. 5/24/18 at 61; Def. Ex. 185.) KVG, however, did not contemporaneously track time it spent on this contract. (N.T. 5/23/18 at 221; N.T. 5/24/18 at 85.) In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any issues with this contract until after this case was filed. (N.T. 5/24/18 at 85-87; N.T. 5/23/18 at 221.)

F. Kandahar Regional Medical Equipment

On July 19, 2013, Target and KVG entered into an agreement for the purchase and delivery of medical equipment for the Kandahar Regional Medical Center. (Dkt. No. 222 - Stipulated Finding of Fact No. 20.) On or about October 2, 2013, Target delivered medical equipment to the Government. (Dkt. No. 222 - Stipulated Finding of Fact No. 21; N.T. 5/24/18 at 133.) The Government acknowledged receipt of the medical equipment under the contract. (Dkt. No. 222 - Stipulated Finding of Fact No. 22.) The Government retained possession of, and did not reject or attempt to return, the medical equipment. (Dkt. No. 222 - Stipulated Finding of Fact No. 22; N.T. 5/21/18 at 149.)

The Government paid KVG in full for the medical equipment delivered by Target. (Dkt. No. 222 - Stipulated Finding of Fact No. 22; N.T. 5/24/18 at 134.) KVG paid Target for the medical equipment it delivered, and the contract was closed out in 2013. (Dkt. No. 222 - Stipulated Finding of Fact No. 22; N.T. 5/24/18 at 113, 134; N.T. 5/23/18 at 219; N.T. 5/21/18 at 148-149.) Neither the Government nor KVG returned the medical equipment Target delivered. (Dkt. No. 222 - Stipulated Finding of Fact No. 24.)

KVG listed the contract as an example of a contract completed to the satisfaction of the Government, and as an example of past contract performance by both KVG and Target in a subsequent May 11, 2014 technical factor, and again in another proposal. (Pl. Ex. 15; Def. Ex. 175; N.T. 5/23/18 at 212-214.) This example formed part of the proposal packages submitted to the Government when KVG was seeking other contracts. (Id.)

KVG did not make any further mention with respect to the Kandahar medical equipment until March 20, 2015, more than 17 months after it had been delivered to the

Government, and more than 16 months after KVG had paid Target. (N.T. 5/21/18 at 146-147.) The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the medical center equipment. (N.T. 5/21/2018 at 146-148.) During his testimony at trial, Mr. Abbott confirmed that at no point between 2013 and March 2015 did KVG give notice to Target that it was revoking acceptance of the medical equipment delivered to Kandahar, returning the medical equipment, or seeking damages. (N.T. 5/21/18 at 149.) No evidence was presented at trial about any damages suffered by KVG as a result of this contract.

G. Kandahar Power Consumables

On May 21, 2014, Target and KVG entered into a valid and enforceable agreement for the purchase and delivery of power plant consumables for delivery to Kandahar Province, Afghanistan under KVG's contract with the Government, Contract No. W56KJD-14-C-009. (Def. Ex. 183; Dkt. No. 222 - Stipulated Finding of Fact No. 25; N.T. 5/24/2018 at 45.) 233. In its proposal to the Government, KVG did not estimate or calculate its labor burden for the contract. (N.T. 5/21/18 at 149.)

On May 30, 2014, Target informed KVG it could not provide the required goods under the contract for the quoted price. (Def. Ex. 176; N.T. 5/24/2018 at 44-45.) Almost immediately upon KVG receiving the award from the Government, Target informed KVG that there were two parts of the contract that they could not supply for the quoted prices. (Def. Ex. 180; N.T. 5/23/18 at 180, 207-208.) Target underbid the contract by approximately $900,000. (N.T. 5/24/18 at 46.)

Less than 10 days from the date of the award, KVG then informed the Government of the mistake in the bid, and requested that the Government terminate the contract for convenience. (Def. 180; N.T. 5/23/18 at 181.) On June 14, 2014, the contract was terminated for the Government's convenience prior to delivery at no cost to the parties. (Def. Ex. 181; N.T. 5/23/18 at 136, 183.) KVG flowed down the same terms, of no-cost, that it received from the Government, to Target. (Pl. Ex. 24; N.T. 5/23/18 at 216-217.) The contract was terminated for convenience, and closed out, in June 2014. (N.T. 5/24/18 at 134.) KVG did not make any further mention with respect to the Kandahar power consumables contract until March 20, 2015, nearly 9 months after the termination for convenience. (N.T. 5/21/18 at 146-147.)

Mr. Boyer testified that in all of his other dealings in Afghanistan, totaling approximately 400 contracts, no other contract was ever terminated for convenience, prior to this occurrence. (N.T. 5/23/18 at 141.) Following this termination for convenience, Mr. Abbott testified that KVG did not receive any more requests for quotes or proposals from the Government with respect to Afghanistan. (N.T. 5/24/18 at 50-51.)

KVG asserts that it lost profit on the Kandahar Power Consumables project in the amount of $241,307.19. (Def. Ex. 185; N.T. 5/24/18 at 63.) KVG further contends that it spent approximately 144 hours (amounting to $14,400 in alleged compensatory damages (144 hours x $100/hr)) in preparing the proposal, investigating the value of parts, and addressing the incorrect Target quote, for a total loss of $255,707.19 in lost profit and damages on this contract. (Def. Ex. 185; N.T. 5/24/18 at 63, 84-85.) KVG, however, did not contemporaneously track time it spent on this contract. (N.T. 5/23/18 at 221; N.T. 5/24/18 at 85.) In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any

issues with this contract until after this case was filed. (N.T. 5/24/18 at 85-87; N.T. 5/23/18 at 221.)

H. Shorabak Counterclaim Damages

KVG reduced the price of the Shorabak Contract by $38,241.20 in order to settle with the Government. (N.T. 5/24/18 at 59; Def. Ex. 185.) KVG also estimates that it spent 280 hours in attempting to address issues with the Shorabak Contract at a rate of $100 per hour for a total of $28,000. (N.T. 5/24/18 at 59; Def. Ex. 185.) Similar to the preceding counterclaim contracts, KVG did not contemporaneously track the time it spent on this contract. (N.T. 5/23/18 at 221; N.T. 5/24/18 at 85.) In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any issues with this contract until after this case was filed. (N.T. 5/24/18 at 85-87; N.T. 5/23/18 at 221.) KVG also asserts that it spent travel costs in the amount of $9,600 for a trip to Kabul in order to address issues with the Shorabak Contract.[19] (N.T. 5/24/18 at 60; Def. Ex. 185.) Accordingly, KVG avers that it is entitled to a total of $75,841.20 in compensatory damages relating to the Shorabak Contract. (Def. Ex. 185.)

I. Paktiya Counterclaim Damages

KVG reduced the price of the Paktiya Contract by $63,519.74 in order to settle with the U.S. Government. (N.T. 5/24/18 at 61; Def. Ex. 185.) KVG also estimates that it expended a total of 280 hours in attempting to address issues with the Paktiya Contract at a rate of $100 per hour for a total of $28,000. (N.T. 5/24/18 at 61; Def. Ex. 185.) KVG, however, did not contemporaneously track time it spent on this contract. (N.T. 5/23/18 at 221; N.T. 5/24/18 at

---

[19]     No receipts were submitted to the Court.

85.)  In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any issues with this contract until after this case was filed.  (N.T. 5/24/18 at 85-87; N.T. 5/23/18 at 221.)  KVG avers that it suffered a total of $91,519.74 in compensatory damages relating to the Paktiya Contract.  (Def. Ex. 185.)

## V. Post-Contract

KVG has not sought any solicitations in Afghanistan since 2014.  (N.T. 5/23/18 at 145, 238, 252.)  In late 2014, Mr. Abbott told Mr. Ahmadi he did not see any contracts "worth doing" in Afghanistan in 2015.  (Pl. Ex. 80.)  Mr. Abbott testified that a contracting officer[20] told him that KVG would no longer receive opportunities from CENTCOM.[21]  (N.T. 5/21/18 at 37; N.T. 5/23/18 at 152-153.)  Mr. Abbott later testified, however, that he knew that a contracting officer does not have the power to do that.  (N.T. 5/21/18 at 37.)  There are no emails which corroborate KVG's assertion that a contracting officer told Mr. Abbott that KVG would no longer receive opportunities in Afghanistan. (N.T. 5/23/18 152-154.)

Mr. Boyer confirmed that KVG is not, and never has been, on a government list excluding KVG from getting government contracts. (N.T. 5/23/18 at 254-255.)  Mr. Boyer believes that if KVG was still operating in Afghanistan, they would be "doing the same amount of business."  (N.T. 5/23/18  at 245.)

---

[20]     The testimony of record specifically refers to Kari Pelton as the contracting officer in question. (N.T. 5/23/18 at 152-154.)  Again, this Court notes that Kari Pelton was not called to testify as a witness at trial, nor was any deposition testimony of her presented into evidence at trial.

[21]     The Afghanistan Theater of Operations came within the area of responsibility of the United States Central Command ("CENTCOM"), which was one of the U.S. Department of Defense's combatant commands. (N.T. 5/21/18 at 15.)

On May 20, 2018, Mr. Abbott created a chart (Def. Ex. 185) calculating KVG's purported damages on each of the contracts. (N.T. 5/24/18 at 59.) The chart includes the number of hours Mr. Abbott estimates KVG spent "fixing the issues" on each of the contracts. (N.T. 5/24/18 at 58-59, 85-87.) In making the chart, Mr. Abbott testified that he did not consult any ledgers that were prepared contemporaneously with the contract at issue in creating these estimates, stating that no ledgers actually exist with respect to any of the aforementioned contracts. (N.T. 5/24/18 at 85-87.)

## DISCUSSION

### I. Applicable Law

Both Target and KVG, as merchants dealing in goods, have agreed that Pennsylvania's Uniform Commercial Code ("Pennsylvania UCC"), Article 2, 13 Pa.C.S. § 2101 et seq. governs this transaction.[22] See 13 Pa.C.S. § 1105(a).

A contract for the sale of $500 or more of goods is not enforceable absent a sufficient writing showing a contract between the parties, signed by the party against whom enforcement is sought. 13 Pa.C.S. § 2201(a). A contract may be made "in any manner sufficient to show agreement, including conduct by other part[y] which recognizes the existence of such a contract." Id. § 2204(a). Generally, the seller is obligated to deliver the goods and the buyer must accept and pay in accordance with the parties' contract. Id. § 2301. The buyer, however, may accept, reject, or accept and reject in part nonconforming goods. Id. § 2601(l)-(3).

*Acceptance/Rejection*

---

[22] Counsel for Target and KVG parties agreed, at the closing arguments in this case held August 30, 2018, that the Pennsylvania UCC and Pennsylvania law apply to this case. See Transcript of Closing Arguments dated August 30, 2018, Dkt. No. 230, at 10.

The Pennsylvania UCC establishes that acceptance of goods occurs when a buyer (1) after a reasonable opportunity to inspect, signifies to the seller the goods are conforming or that it will retain them despite a nonconformity; (2) fails to reject the goods within a reasonable time; or (3) takes any act inconsistent with the seller's ownership.  13 Pa.C.S. § 2606(a); see In re Witmer, 541 B.R. 769, 774 (Bkrtcy. M.D. Pa. 2015); David's Bridal, Inc. v. Cels Enterprises Inc., No. 13-2870, 2015 WL 13651382, at *8 (E.D. Pa. Mar. 20, 2015)

To avoid acceptance, a buyer must reject the goods within a reasonable time after their delivery or tender, and it is ineffective unless the buyer seasonably notifies the seller of his rejection.  13 Pa. C.S.A. § 2602(a).  If the buyer does not seasonably take such action, he has accepted the goods and may no longer reject them.  Id.; Comfort Springs Corp. v. Allancraft Furniture Shop, 67 A.2d 818, 820 (Pa. Super. 1949); see also Ireland Bros. v. Refowich Bros., 90 Pa. Super. 221, 225 (1927) (buyer is deemed to accept goods after a reasonable time for examination, unless he promptly and unequivocally rejects them).  Mere complaint as to quality of the goods, while exercising dominion over the goods, does not amount to a rejection.  Comfort Springs Corp., 67 A.2d at 820.  A buyer can reject goods either by informing the seller in writing or by actually returning the goods. Julian C. Cohen Salvage Corp. v. Eastern Elec. Sales Co., 206 A.2d 331, 334 (Pa. Super. 1965).

*Revocation*

Knowing acceptance of non-conforming goods merely prevents a buyer's subsequent rejection of the goods; it does not impair any other remedy provided by the code. See 13 Pa.C.S. § 2607(b); Beaver Valley Alloy Foundry, Co. v. Therma-Fab, Inc., 814 A.2d 217, 220 (Pa. Super. 2002); Marbelite Co. v. City of Philadelphia, 222 A.2d 443, 444–445 (Pa. Super.

1966).

Pursuant to § 2608 of the UCC, a buyer may revoke acceptance of goods when a nonconformity "substantially impairs its value to him if he has accepted it." 13 Pa.C.S. § 2608(a). In order to revoke acceptance, a buyer must establish that said acceptance was based (1) on the reasonable assumption that the goods' nonconformity would be cured and it has not been seasonally cured, or (2) without discovery of such nonconformity, if its acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the assurances of the seller. 13 Pa.C.S. § 2608(a).

Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. 13 Pa.C.S. § 2608(b). The Code's definition of "reasonable time" explains that it "depends on the nature, purpose and corcumstances of the action." 13 Pa.C.S. § 1205(a). However, merchants are held to higher standards regarding timeliness. David's Bridal, 2015 WL 13651382, at *11. The purpose of this requirement is to prevent surprise and allow the seller an opportunity to cure; allow the seller to investigate and prepare for litigation; to open the way for settlement; and to protect the seller from stale claims. See David's Bridal, 2015 WL 13651382, at *10. If one effectively revokes acceptance of goods, they are placed in the same legal position as if they properly rejected the goods in a timely manner, allowing them to pursue a breach of contract claim. David's Bridal, Inc. v. Cels Enterprises Inc., 2015 WL 13651382, at * 9 (citing 13 Pa. C.S.A. § 2608).

*Breach of Warranty*

A party may recover damages for breach of warranty pursuant to 13 Pa.C.S. § 2714, which provides as follows:

> Damages of buyer for breach in regard to accepted goods
>
> (a) Damages for nonconformity of tender. Where the buyer has accepted goods and given notification (section 2607(c)) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the breach of the seller as determined in any manner which is reasonable.
>
> (b) Measure of damages for breach of warranty. The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (c) Incidental and consequential damages. In a proper case any incidental and consequential damages under section 2715 (relating to incidental and consequential damages of buyer) may also be recovered.

13 Pa.C.S. § 2714. This section deals with the remedies available to the buyer after the goods have been accepted, and the time for revocation of acceptance has gone by; it provides a remedy for a buyer who still owes part of the purchase price. See 13 Pa.C.S. § 2714, comment 1.

In the event of a breach of warranty, a non-breaching party is permitted to deduct its damages against the contract balance. This principle is embodied in 13 Pa.C.S. § 2717, which provides as follows:

> Deduction of damages from price
>
> The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same

contract.

See Beaver Valley Alloy Foundry, Co. v. Therma-Fab, Inc., 2002 PA Super 402, ¶¶ 8-9, 814

A.2d 217, 220–21 (2002) (citing 13 Pa.C.S. § 2717).  This section permits the buyer to deduct

from the price damages resulting from any breach by the seller; the breach involved must be of

the same contract under which the price in question is claimed to have been earned.  See 13

Pa.C.S. § 2717, comment 1.

## II. Shorabak and Paktiya Contracts

### A.  Acceptance

We conclude that the Government ultimately accepted the goods delivered with

respect to each of these contracts.  More specifically, with respect to the Shorabak Contract, we

note that as of July 23, 2014, Major Greener had emailed Mr. Ahmadi, stating that "[w]e have

now received approximately 94% of all the equipment."  Although he described certain

equipment as used or broken, Major Greener stated that "we will accept the equipment but

discuss options open to us. … the equipment has been delivered, installed and is currently being

tested ahead of training."

During the course of the Shorabak Contract, we recognize that the Government

requested that Target replace some of the items delivered.  Captain Cole testified that some items

were replaced, but if items could not be replaced, the Government would "modify them, paint

them, bend them," etc.  Captain Cole found that Target's representative, Imdad Khan, "genuinely

tried to help [the Government] rectify [their] problems."  In fact, in a letter dated September 23,

2014, Captain Cole stated that "Imdad was instrumental in delivering all of the Shorabak Trauma

Center equipment and rectifying the problems and discrepancies identified" noting that he

"replaced the damaged items, arranged for modification of electronically incompatible items, and did his very best to rectify all problems noted."

The record as a whole demonstrates that the Government either exchanged, kept, used, or modified all of the items that Target delivered to Shorabak. Ultimately, Captain Cole testified that despite some delays, Shorabak was a "functioning trauma center" that "worked very well" and "served its purpose" when U.S. and British forces departed the trauma center. Captain Cole confirmed that as of October 18, 2014, all of the equipment and supplies that Target delivered, whether it was with the original shipment or sent as a replacement, was being used at the trauma center.

KVG and the Government modified the Shorabak Contract to provide the Government with a five percent discount on the entire contract. On August 29, 2014, KVG sent the Government an invoice with an itemized breakdown of the items Target delivered to Shorabak, in the amount of $726,582.75, reflecting the negotiated five percent discount, which was a reduction of $38,241.20 on the contract. On September 24, 2014, the Government paid KVG $726,582.75, thereby closing out the contract.

With respect to the Paktiya Contract, we note that following Target's first delivery of goods to Paktiya, thirty-seven out of seventy items were incorrect, damaged, or missing. Ms. Pelton instructed Captain Zamperini to indicate in an excel spreadsheet which items the Government would keep, reject, or request Target replace. Ms. Pelton further instructed Captain Zamperini that "if you want [Target] to replace the item then the [Government] should not accept or pay for the item until it is satisfactory. You can also just reject/cancel the item and have them take whatever they brought back with them." Captain Zamperini used a color-coded spreadsheet

of item discrepancies on the Paktiya contract, with green indicating that the correct contract item had been delivered; yellow indicating that the Government needed to verify the item; and red indicating that the item needed to be replaced. At trial, this spreadsheet was admitted into evidence. According to the spreadsheet, there were only three items color coded in red on the chart, and the rest were yellow or green.

The record demonstrates that Target did replace some of the goods initially delivered with conforming items. According to Captain Zamperini, Target made multiple attempts to fix discrepancies, but at the end of the process there were still some items that were incorrect and damaged. The Government accepted nonconforming goods if they were still useful to the Afghan Army. The record as a whole demonstrates that the Government either exchanged, kept, used, or modified all of the items that Target delivered to Paktiya.

On September 19, 2014, Captain Zamperini informed Mr. Ahmadi by email that the contract was "being adjusted according to the items delivered." On September 20, 2014, KVG sent an invoice for the Paktiya Contract to the Government in the amount of $138,447.86, reflecting a negotiated discount, a reduction of $63,519.74 on the contract. The discount was reached based on the spreadsheet exchanged between the Government and KVG. On October 14, 2014, KVG received payment from the Government for the Paktiya Contract in the amount of $138,447.86, constituting 69 percent of the contract price.

The terms of both the Shorabak Contract and Paktiya Contract required that a DD250 be prepared. The signature box on the standard DD250 form has a check box that says "Acceptance of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents." Although KVG maintains that it

does not have a copy of the DD250 for either the Shorabak or Paktiya Contracts, there is no dispute that the Government signed a DD250 for each of those contracts, thereby triggering payment by the Government to KVG. We conclude, therefore, that regardless of which items were listed or which box was checked on the DD250 form, the Government certified that $726,582.75 and $138,447.86 worth of goods conformed to the respective contracts, or would be accepted in spite of their nonconformity, as required by §2606 of the Pennsylvania UCC. The payment by the Government constitutes acceptance of the goods delivered, whether the goods were nonconforming or in accordance with the contract.

Further, under § 2606(a)(3) of the Pennsylvania UCC, "[a]cceptance of goods occurs when the buyer ... does any act inconsistent with the ownership of the seller...." 13 Pa. C.S. § 2606(a)(3). In Marbelite Co. v. City of Philadelphia, 222 A.2d 443 (Pa. Super. 1966), the seller sued the City of Philadelphia to recover the contract price of traffic signal equipment which the city had installed and had been using for an extended period. See Varrasso v. Home Depot U.S.A., Inc., No. 17-1226, 2018 WL 3820547, at *4 (W.D. Pa. Aug. 10, 2018) (citing Marbelite, 222 A.2d 443, 444 (Pa. Super. 1966)). The city argued that there was no acceptance because the equipment failed to meet certain specifications. Id. The court rejected that argument and held that the city's use of the equipment was patently inconsistent with the seller's ownership and, therefore, constituted acceptance under the UCC. Id. This Court has also previously determined that actions such as unloading, unpacking, and storing the goods in the buyer's own facilities, "constitute action inconsistent with [the seller's] ownership of the produce and, accordingly, constituted acceptance" under the UCC. See Food Team Int'l Ltd. v. Unilink, 872 F. Supp. 2d 405, 427 (E.D. Pa. May 18, 2012) (Gardner, J.) (citing 13 Pa.C.S. §§ 2606(a), 2607(a)).

We find that the Government and KVG took several actions that were inconsistent with Target's ownership of the goods.  In both Shorabak and Paktiya, the Government either exchanged, kept, used, or modified the goods delivered by Target, and neither KVG, nor the Government, attempted to return any of the goods to Target following payment by the Government to KVG.  Such actions constitute acceptance.  See, e.g., Marbelite, 222 A.2d at 444 ("We believe the use of the equipment by defendant is patently inconsistent with the seller's ownership and, therefore, constitutes acceptance … Since we have determined that defendant accepted the equipment it is obligated to pay the contract price therefor."); Food Team Int'l, Ltd., 872 F. Supp. 2d at 412, 427 (The buyer's unpacking and storage of several shipments of produce in cold storage facilities constituted acceptance and "gave rise to a duty to pay the contract price[.]")  KVG contracted to pay $678,534.84 to Target following completion of the Shorabak Contract.  With respect to the Paktiya Contract, KVG contracted to pay Target $179,136.48 to Target upon completion.  These amounts are due and owing to Target.

B. KVG Counterclaim - Revocation

In order to recover on its counterclaim, KVG must show that it revoked the goods for both the Shorabak and Paktiya Contracts in the manner required by the UCC.  13 Pa.C.S. § 2608.  The UCC provides that under certain circumstances, which KVG asserts occurred here, an acceptance of goods may be effectively revoked.  13 Pa.C.S. § 2608.  Accordingly, the issues are: whether the nonconformity of the goods was a "substantial impairment;" whether Target seasonably cured any non-conformities; and, if not, whether KVG revoked acceptance within a reasonable time.

*"Substantially Impaired"*

During the performance of the Shorabak Contract, Captain Cole sent emails indicating that he was disappointed with the quality of some of the items Target delivered. Some of the items appeared to be used goods, and were bent, chipped, rusted, or broken. At trial, Captain Cole specifically testified that the ventilators provided by Target were old; images had been burnt into monitors; operating room ceiling lights were not correct, and appeared to have been pulled out of other buildings; the equipment sterilizer was broken; and a few items had broken down just a few hours after use. Captain Cole commented that while some items were replaced by Target, other items that could not be replaced were modified by the Government and put in use. Ultimately, however, Captain Cole testified that despite some delays, Shorabak was a "functioning trauma center" that "worked very well" and "served its purpose." Captain Cole confirmed that all of the supplies that Target delivered, whether a part of the original shipment or sent as replacement, were being used at the trauma center.

During the performance of the Paktiya Contract, Captain Zamperini acknowledged that nonconforming items were delivered by Target. In fact, with Target's first delivery of goods to Paktiya, thirty-seven out of seventy items were incorrect, damaged, or missing. According to Captain Zamperini, Mr. Ahmadi made multiple attempts to fix discrepancies and replace items, but at the end of the process there were still some items that were incorrect and damaged.

Both the Shorabak and Paktiya Contracts called for all new items with specific brand and part numbers. However, as evidenced by the testimony of both Captain Cole and Captain Zamperini, some of the items delivered appeared to be used, damaged, or were incorrect.

Some items delivered had to be modified before they could be put to use in each of the hospitals. Moreover, the contract prices paid to KVG by the Government on both Shorabak and Paktiya were adjusted in accordance with the items delivered, resulting in an approximate five percent discount on Shorabak and an approximate thirty-one percent discount on Paktiya. While it does appears from the record as a whole that the items delivered were ultimately put to use in both Shorabak and Paktiya, we conclude, given all of the evidence, that the value of the goods delivered was substantially impaired. Target did send, at least in part, nonconforming goods on both contracts.

*"Seasonably Cured"*

Based on the record evidence, it does not appear that Target seasonably cured all of the nonconforming items that were delivered to Shorabak and Paktiya. Captain Cole commented that while some items were replaced by Target, other items that could not be replaced were modified by the Government and put in use. At Paktiya, Captain Zamperini noted that although Target made multiple attempts to fix discrepancies and replace items, at the end of the process there were still some items that were incorrect and damaged. Accordingly, we are unable to conclude that Target seasonably cured all of the goods delivered.

*"Timely Revocation"*

The final issue is whether KVG effectively revoked acceptance of the goods delivered to Shorabak and Paktiya. The burden falls on KVG to show that revocation was proper and timely. See David's Bridal, 2015 WL 13651382, at *10.

In this case, it is clear that the Government, KVG, and Target continued to discuss issues concerning the goods delivered to Shorabak and Paktiya up until payment was made by the

Government to KVG on September 24, 2014 for the Shorabak Contract and until payment was made by the Government to KVG on October 14, 2014 for the Paktiya Contract. As is noted in David's Bridal, these efforts bear on whether KVG "acted within a reasonable time as to its invocation of revocation, insofar as the UCC and general commercial realties do not presuppose that a party will revoke nonconforming goods which it believes will be remedied through less severe measures." David's Bridal, 2015 WL 13651382, at *13 (citing Cardwell v. Int'l Hous., Inc., 423 A.2d 355, 362 (Pa. Super. 1980) ("Among the factors to be considered in determining the passage of a reasonable time for revoking acceptance is whether the seller attempted to correct the nonconforming nature of the goods."); Fortin v. Ox-Bow Marina, Inc., 557 N.E.2d 1157, 1163 (Mass. 1990) (quoting Vista Chevrolet, Inc. v. Lewis, 704 S.W.2d 363, 369 (Tx. Ct. App. June 28, 1985)) ("Many courts have held that any delay on the part of the buyer in notification of revocation of acceptance is justified where the buyer is in constant communication with the seller regarding nonconformity of the goods, and 'the seller makes repeated assurances that the defect or nonconformity will be cured and attempts to do so.' ").)

The record demonstrates that negotiations, primarily in the form of emails, started shortly after the initial deliveries of goods arrived to Shorabak and Paktiya. Once the Government paid KVG on each of those contracts, however, negotiations ceased. Following payment by the Government in September and October of 2014, there is nothing in the record which suggests that either the Government or KVG was waiting for further replacement or "cure" by Target of items previously delivered. Certainly, there is no communication from KVG to Target following its receipt of payment from the Government which expresses that if certain items weren't cured or replaced, KVG would return goods, revoke its acceptance, or refuse to

pay Target under either contract.

In fact, the only communication which occurred between KVG and Target following payment by the Government consisted of repeated inquires by Mr. Ahmadi as to when Target might receive payment for its performance on the Shorabak and Paktiya Contracts. In late 2014, Mr. Ahmadi asked Mr. Abbott whether there was any update regarding payment on the Shorabak and Paktiya contracts. Mr. Abbott, choosing not to disclose that KVG had already received payment from the Government, instead responded that he was "[w]orking on it," and "no date yet, you know how it goes" in response to Mr. Ahmadi's pleas for payment owed to his suppliers.

On October 15, 2014, Mr. Ahmadi requested payment of the invoice he submitted to KVG for the Shorabak Contract. Mr. Abbott responded that "[w]e are still working on the payment process" and, again, did not tell Mr. Ahmadi that KVG had already received payment from the Government. In November 2014, Mr. Ahmadi contacted Mr. Abbott several times, requesting evidence that the Government was withholding payment to KVG so that he could show his suppliers who were demanding payment or an explanation. Again, Mr. Abbott did not tell Mr. Ahmadi that KVG had already been paid by the Government.

In December 2014, Mr. Abbott told Mr. Ahmadi that "the contract is under review" and that "the payments are [on] hold due to a problem," and later that "[w]ith the US holidays now starting, we expect no further progress until the middle of January. We will keep you updated as to any further requests at that time." Mr. Abbott did not tell Mr. Ahmadi that KVG was the one holding the money.

In February 2015, and several times again in March 2015, Mr. Ahmadi inquired about payment, noting that Target was in "big trouble" regarding payment, to which Mr. Abbott continued to respond that "the narrative is still in process," "update will be coming soon," and "things are moving slowly and still under review," never telling Target that they had already received payment. By March 3, 2015, KVG had decided that it was not going to pay Target, claiming it did not know what was delivered to Paktiya and Shorabak.

On March 20, 2015, KVG sent a letter to Target stating that KVG would be holding payment on the Shorabak and Paktiya Contracts, totaling $857,671.32 for two years pending resolution or any adverse action by the Government on either contract. The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that the Government had not been withholding payment, and that KVG was considering seeking damages against Target for several of the parties' contracts. At no point prior to March 20, 2015, did KVG, on any of the parties' contracts, request that Target take any items back, or state that it would be seeking damages from Target. Where the Shorabak Contract ended in September 2014 and the Paktiya Contract ended in October 2014, any attempted revocation after five months was untimely. See David's Bridal, 2015 WL 13651382, at *10 (citing EPN-Delaval, S.A. v. Inter-Equip, Inc., 542 F. Supp. 238, 248 (S.D. Tex. 1982) (buyer "should have discovered the [patent] non-conformity of the [goods] shortly after they arrived in Mexico on April 24, and should have revoked its acceptance within a matter of weeks, not months, of that time"); Hays Merch., Inc. v. Dewey, 474 P.2d 270, 273 (Wa. 1970) (en banc) (toys delivered in October and November were not timely revoked in mid-February "[i]n view of the seasonal nature of the toy business and the somewhat faddish demand for certain toys"); see also Tinius Olsen Testing Mach. Co. v. Wolf Co., 146 A. 541, 542

46

(Pa. 1929) (applying the Uniform Sales Act and finding that one month delay in claiming rescission of machine with obvious defect was unreasonable).

Based on these cases, and our consideration of the evidence presented in this matter, we conclude that KVG has not timely revoked its acceptance of the goods delivered to Shorabak and Paktiya.  KVG, therefore, must pay for the goods accepted under both contracts. See Beaver Valley Alloy Foundry, Co. v. Therma-Fab, Inc., 814 A.2d 217, 220 (Pa. Super. 2002) (citing 13 Pa.C.S. § 2607(a) ("The buyer must pay at the contract rate for any goods accepted."); In re Repco Products Corp., 100 B.R. 184 (Bkrtcy.E.D.Pa.) (1989) (pursuant to 13 Pa.C.S. § 2607(a), where nonconforming goods are accepted, buyer is liable for contract price irrespective of whether he is entitled to damages associated with nonconformity)).  Again, as noted above, KVG contracted to pay $678,534.84 to Target following completion of the Shorabak Contract. With respect to the Paktiya Contract, KVG contracted to pay Target $179,136.48 to Target upon completion.  These amounts are due and owing to Target.

### C.  KVG's Counterclaim[23] - Breach of Warranty

KVG's failure to reject or timely revoke its acceptance of the goods delivered to Shorabak and Paktiya, however, does not impair any other remedy provided under the UCC for nonconformity.  Knowing acceptance of nonconforming goods merely prevents a buyer's

---

[23]    We note that with respect to the Shorabak Contract, KVG asserts its counterclaim against Target as well as Afghani Defendants, Qais Anil Medical Equipment Company Ltd and Mohammad Sediq.  The Clerk of Court has entered default against Qais Anil Medical Equipment Company Ltd and Mohammad Sediq.  With respect to the Paktiya Contract, KVG asserts its counterclaims against Target and Afghani Defendant, Asia Pharma Ltd.  The Clerk of Court has entered default against Asia Pharma Ltd.

Despite the entry of default by the Clerk of Court, we note that neither Target nor KVG presented any facts at trial or in their respective post-trial submissions concerning any of these entities/individuals. Accordingly, there has been no evidence presented which would warrant a finding of damages against them.

subsequent rejection of the goods; it does not impair any other remedy provided by the code.  See 13 Pa.C.S. § 2607(b).

KVG asserts that it may set-off its damages for breach of warranty against the contract prices for both Shorabak and Paktiya pursuant to 13 Pa.C.S. § 2714.  Under the Pennsylvania UCC, the buyer must give a seller timely notice of a breach of warranty.  The Pennsylvania UCC states that "where a tender has been accepted: (1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." 13 Pa.C.S. § 2607(c)(1).  The content of the notification need not be formal; it need only inform the seller that the transaction involves a breach.  13 Pa.C.S. § 2607 comment 4.; Cancun Adventure Tours, Inc. v. Underwater Designer Co., 862 F.2d 1044 (4th Cir. 1988) (holding that the UCC's notice provision does not require that a buyer's notification of a defect include a clear statement of all objections, but that a buyer simply is required to notify the seller that the transaction is "troublesome"). Oral notice can suffice provided that it informs the seller that the transaction involves a breach.  General Instrument Corp., F.W. Sickles Division v. Pa. Pressed Metals, Inc., 366 F. Supp. 139, 147 (M.D. Pa. 1973), aff'd, 506 F.2d 1051 (3d Cir. 1974).

We agree with KVG that notice of the nonconformity as to the some of the goods delivered to Shorabak and Paktiya was made orally and in written communication (in the form of emails) on a continued basis during the performance of both the Shorabak and Paktiya Contracts. Both the Shorabak and Paktiya Contracts called for all new items with specific brand and part numbers.  However, as evidenced by the testimony of both Captain Cole and Captain Zamperini, some of the items delivered appeared to be used, damaged, or were incorrect. Some items

delivered had to be modified before they could be put to use in each of the hospitals.

With respect to the Shorabak Contract, Mr. Ahmadi of Target was forwarded an email from Ms. Pelton on July 18, 2014 advising that there were "serious issues related to the quality of products and services on the subject contract. … my office will be preparing a cure notice detailing KVG's deficiencies, which will ultimately reflect in KVG's past performance if not corrected." Mr. Boyer of KVG expressed to Mr. Ahmadi that the situation "needs to be corrected immediately," and directed him to "outline a clear plan to fix any identified discrepancies." The record also contains numerous emails to Target from the Government and KVG indicating that the items delivered to Shorabak appeared to be used goods, and were bent, chipped, rusted, or broken.

During the performance of the Paktiya Contract, Captain Zamperini acknowledged that nonconforming items were delivered by Target. In fact, with Target's first delivery of goods to Paktiya, thirty-seven out of seventy items were incorrect, damaged, or missing. According to Captain Zamperini, Mr. Ahmadi made multiple attempts to fix discrepancies and replace items, but at the end of the process there were still some items that were incorrect and damaged. On September 19, 2014, Captain Zamperini informed Mr. Ahmadi by email that the contract was "being adjusted according to the items delivered."

Based on our review of the evidence submitted at trial, we conclude that Target breached the express warranty that all of the goods delivered on the Shorabak and Paktiya Contracts would be new items with specific brand and part numbers. Based on the evidence submitted to the Court, it is clear that at least some of the goods delivered to both Shorabak and Paktiya were not of the same quality as called for by the respective contracts. In fact, as noted

above, the contract prices paid to KVG by the Government on both Shorabak and Paktiya were adjusted in accordance with the items delivered, resulting in an approximate five percent discount on Shorabak, and an approximate thirty-one percent discount on Paktiya.

In a breach of warranty action, a buyer may recover "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." David's Bridal, 2015 WL 13651382, at *17 (citing 13 Pa. Cons. Stat. § 2714(b)). Incidental and consequential damages may also be recovered "in a proper case." Id. (citing 13 Pa.C.S. § 2714(c)). Incidental damages include: (1) expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected; (2) any commercially reasonable charges, expenses or commissions in connection with effecting cover; and (3) any other reasonable expense incident to the delay or other breach. 13 Pa. C.S. § 2715(a). Consequential damages resulting from the breach of the seller include: (1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (2) injury to person or property proximately resulting from any breach of warranty. 13 Pa. C.S. § 2715(b). Consequential damages may include lost profits. David's Bridal, 2015 WL 13651382, at *18.

In this matter, we find it reasonable to reduce the amount owed on the contracts based on the diminution in value of the goods delivered under the Shorabak and Paktiya Contracts. Based on our review of the evidence presented, we conclude that during the performance of the Shorabak Contract, the Government determined that there would be a

reduction in the contract price as a result of the delivery of some nonconforming goods by Target. Ultimately, the Government reduced the contract price payable to KVG by five percent, resulting in a monetary deduction of $38,241.20 on the contract. We find that this reduction in price represents the loss of value in the goods that was delivered as a result of nonconformity. In other words, the value of the goods accepted was $38,241.20 less than the value that they would have been had the goods been as warranted. Accordingly, KVG is entitled to a deduction in the amount of $38,241.20 on the Shorabak Contract. 13 Pa.C.S. § 2717.

 With respect to Paktiya, our analysis of damages on the breach of warranty is the same. Based on our review of the evidence presented, we conclude that during the performance of the Paktiya Contract, the Government determined that there would be a reduction in the contract price as a result of the delivery of some nonconforming goods by Target. In fact, the discount was reached based on the spreadsheet exchanged between the Government and KVG. Ultimately, the Government reduced the contract price payable to KVG by approximately thirty-one percent, resulting in a monetary deduction of $63,519.74 on the contract. We find that this reduction in price represents the loss of value in the goods that was delivered as a result of nonconformity. In other words, the value of the goods accepted at Paktiya was $63,519.74 less than the value that they would have been had the goods been as warranted. Accordingly, KVG is entitled to a deduction in the amount of $63,519.74 on the Paktiya Contract. 13 Pa.C.S. § 2717.

 KVG also asserts that it is entitled to recoup losses incurred because of the man hours required to address the nonconforming goods delivered to Paktiya and Shorabak. KVG estimates that it spent 280 hours in attempting to address issues with the Shorabak Contract at a rate of $100 per hour for a total of $28,000. KVG also estimates that it expended a total of 280

hours in attempting to address issues with the Paktiya Contract at a rate of $100 per hour for a total of $28,000. KVG, therefore, is seeking a total amount of $56,000 in damages for man hours spent on both contracts.

"The law requires that a "claim for damages ... be supported by a reasonable basis for calculation; mere guess or speculation is not enough." AMCO Ins. Co. v. Emery & Assocs., Inc., 926 F. Supp. 2d 634, 647 (W.D. Pa. 2013) (citing Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 197 A.2d 721, 727 (1964)); Institut Pasteur v. Simon, 383 F. Supp. 2d 809, 811–812 (E.D. Pa. 2005) (a party seeking damages must provide the jury with sufficient evidence so that damages may be established with reasonable certainty. "At minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague, or contingent' upon some unknown factor.") (citations omitted). KVG has failed to provide such proof to this Court.

KVG, through the testimony of Mr. Abbott and Mr. Boyer, admits that it did not factor in any labor time when it submitted its proposal to the Government on either of these contracts, and it further admits that it did not contemporaneously track the time it spent on either the Shorabak or Paktiya Contracts. In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any issues with this contract until after this case was filed. KVG did not present any evidence regarding what constitutes a reasonable number of labor hours for a prime contractor or how many labor hours KVG expended on each contract aside from time spent "fixing the issues." It did not provide any detail or description of

the type of work performed[24] and provided no corroborating evidence, including testimony from the Government, regarding the number of hours claimed.

We conclude that KVG's labor hour estimations are vague and unreliable. Mr. Abbott admitted that the estimations were created the night before the damages testimony was presented at trial, four to five years after the contracts were closed out. In estimating the labor hours, which were not recorded at the time of the contract, Mr. Abbott acknowledged that he did not consult any documents or ledgers prepared contemporaneously. These man hour estimates are speculative, and do not form an adequate basis for seeking damages. We conclude that it would be unreasonable for the Court to ascertain damages on such an unreliable assessment of damages.

KVG also asserts that it is entitled to recover $9,600.00 in travel costs expended for a trip to Kabul in order to address issues with the Shorabak Contract. The only testimony concerning this item of damages was Mr. Abbott's testimony that the total cost of his trip to Kabul was $9,600. No travel receipts were submitted to the Court which would support the totality of this expense. KVG did not provide any detail or description of the type of work performed on this trip, and provided no corroborating evidence regarding the travel expenses claimed. KVG has failed to provide adequate proof to this Court, and, accordingly, has not met its burden in establishing a reasonable certainty on these claimed damages.

Finally, KVG asserts that it is entitled to damages because it did not receive any more solicitations for work in Afghanistan following 2015, alleging that it was driven out of

---

[24] Mr. Abbott generally testified that hours were spent "emailing the Government, communicating with Target, . . . [and] on the phone with the contracting office." This is the only description provided of work performed.

business in Afghanistan because of Target's persistent non-performance on the Shorabak and Paktiya Contracts.[25]  KVG suggests that if it was still working in Afghanistan, it could have reached a top line revenue of nearly $10 million dollars.  Accordingly, KVG avers that it is entitled to good will damages for a portion of the nearly $10 million dollars in revenue it would have reached in Afghanistan.

Lost profits may be recovered for breach of contract only when: (1) they are established with reasonable certainty; (2) they are the proximate result of some wrong; and (3) they were reasonably foreseeable.  <u>David's Bridal</u>, 2015 WL 13651382, at *18; <u>Delahanty v. First Pennsylvania Bank, N.A.</u>, 464 A.2d 1243, 1258 (Pa.Super. 1983).  The claimed loss must ordinarily follow the sales contract in the usual course of events or must be one that "reasonable men in the position of the parties would have foreseen as the probable results of that breach." <u>Frank B. Bozzo, Inc. v. Electric Weld Division of Ft. Pitt Bridge Division of Sprang Industries, Inc.</u>, 423 A.2d 702, 709 (Pa. Super. 1980); <u>see also</u> <u>AM/PM Franchise Ass'n v. Atlantic Richfield Co.</u>, 584 A.2d 915, 921 (Pa. 1990) (holding that in order to receive consequential damages, a buyer must prove that the damages were reasonably foreseeable at the time the agreement was entered into).  In other words, claimed future or prospective losses must have been reasonably foreseeable to both parties and cannot be speculative.  <u>See</u> <u>Hughes v. Ireland</u>, 74 Pa. Super. 518, 522 (1920) (Recovery may not be based on mere guesswork or inference without evidence of facts, circumstances, and data justifying an inference that the damages awarded are just and reasonable compensation for the injury suffered.); <u>see also</u> <u>AM/PM Franchise Ass'n</u>, 584

---

[25]     KVG also makes this assertion with respect to the "Kandahar Power Consumables" contract that it presents as one of its counterclaims.  Although this counterclaim is addressed *infra*, we conclude that the same reasoning would apply as to any damages claimed on that counterclaim.

A.2d at 926 (Plaintiff must provide a reasonable basis to calculate damages in order to pursue consequential damages related to loss of good will.).

With respect to the element of causation, "[p]roof of damages need not be mathematically precise, but the evidence must establish the fact 'with a fair degree of probability.'" Advent Systems Ltd. v. Unisys Corp., 925 F.2d 670, 680 (3d Cir. 1991) (citations omitted). In National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491, 496 (3d Cir. 1987), the United States Court of Appeals for the Third Circuit onsidered in detail the type and quantum of evidence needed to demonstrate proximate causation for purposes of lost profits damages. The Third Circuit described the required proof as follows:

> The damages sought must be 'a proximate consequence of the breach, not merely remote or possible . . . . The element of causation defines the range of socially and economically desirable recovery and requires not only 'but-for' causation in fact but also that the conduct be a substantial factor in bringing about the harm.' Where the losses cannot be allocated between those caused by the defendant's breach and those not, an entire claim may be rejected. [Plaintiff] thus had to prove that any lost profits were proximately caused by [defendant's] breach, and not through some other cause. In essence, the proximate causation requirement demands that the plaintiff prove that the defendant's breach was a substantial factor in causing some harm.

National Controls Corp., 833 F.2d at 496.

KVG attributes nearly $10 million dollars in "unrealized projected Afghanistan revenue" for 2015 as a result of Target's performance on the contracts at issue in this case. More specifically, KVG avers that contracting officer Keri Pelton had purportedly removed KVG from the list of contractors to CENTCOM as a result of Target's performance on the contracts at issue in this case. At trial, Mr. Abbott testified that he was told that KVG would no longer receive opportunities from CENTCOM. Mr. Abbott later testified, however, that he knew that a

contracting officer does not have the power to do that. There are no emails corroborating that a contracting officer told Mr. Abbott that KVG would no longer receive opportunities in Afghanistan. No other witnesses, including Government witnesses, testified at trial that KVG was removed from the list of contractors.

KVG failed to present any evidence of proximate causation. Ms. Pelton, in fact, was not called by KVG to testify in this matter. Not only did KVG fail to introduce any evidence that Ms. Pelton indeed informed Target that they had been removed from the list of contractors, or that Target was the reason, Mr. Abbott admitted that he knew Ms. Pelton did not have that power to remove KVG from the list of contractors. In addition, Mr. Boyer confirmed that KVG is not, and never has been, on a government list excluding KVG from getting government contracts. In fact, testimony during the trial indicated that KVG was actually performing work on other Government contracts in Europe and Africa.

Furthermore, KVG failed to address the role its performance on the contracts at issue played in failing to receive any work in Afghanistan in 2015 considering its admitted failure to inspect any goods prior to delivery as contractually required, or its inability or refusal to visit either Paktiya or Shorabak despite repeated requests from the Government when issues arose. In addition, Target introduced evidence at trial that KVG did not seek any solicitations in 2015. Specifically, Mr. Abbott told Mr. Ahmadi in late 2014 that he did not see "anything worth doing" in Afghanistan in 2015. Accordingly, we find that KVG failed to prove that Target was the proximate cause of nearly $10 million in unrealized projected revenue.

We also find that KVG failed to project its estimated lost profits with any degree of certainty, merely relying on Mr. Abbott's unsupported assumptions. KVG did not introduce

any evidence or testimony that showed what contracts were available in Afghanistan in 2015, what requests for quotes the Government would likely have sent to KVG, the likelihood that KVG would have been awarded those contracts, evidence that KVG had the necessary subcontractors to successfully perform those contracts, or calculations of KVG's profit margin on any given contract. Accordingly, we conclude that KVG is not entitled to lost profits.

**III. Counterclaim Contracts**

A. <u>Bagram Flagpole</u>

On April 3, 2013, Target and KVG entered into a contract for the purchase and delivery of a 25-foot flagpole to the Government at Bagram Air Base. On or about April 22, 2013, Target delivered an 18-foot-tall flagpole to the Government at Bagram Air Base. On that same day, the Government acknowledged receipt of the flagpole that Target had delivered, noting that it was not the item as quoted. Target replaced the 18-foot flagpole with a 25-foot flagpole that was consistent with the contract specifications. The Government paid KVG for the flagpole Target delivered, and the Government retained possession of the replacement flagpole.

KVG paid Target for the flagpole it had delivered to Bagram Air Base, and the contract was closed out in 2013. KVG did not make any further mention with respect to the flagpole delivered by Target to Bagram Air Base until March 20, 2015, approximately 23 months after the flagpole had been delivered, and accepted by the Government and KVG. The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the flagpole to Bagram Air Base. KVG now alleges that it suffered $2,000 (20 hours x $100/hr) in compensatory damages in addressing the nonconforming flagpole.

We conclude that the Government accepted the flagpole delivered with respect to this contract. Although the initial delivery by Target may have not contained the precise flagpole as quoted by the contract, Target replaced that flagpole with a 25-foot flagpole that was consistent with the contract specifications. The record demonstrates that the replacement flagpole conformed to the contract, and was acceptable to the Government and KVG. Because KVG has failed to establish that a nonconforming flagpole was ultimately delivered and accepted by the Government, KVG cannot revoke its acceptance of the flagpole.

Likewise, we find that there was no breach of warranty with respect to the flagpole contract because KVG has failed to establish that the replacement flagpole did not conform to the contract, or was otherwise defective. Based on our review of the record evidence, there is no indication that the Government complained about or attempted to return the replacement flagpole that was delivered by Target.

B. Shindad Tent Skin

On June 13, 2013, Target and KVG entered into an agreement for the purchase and delivery of a tent skin to Shindand Air Base. The tent skin was to be fire retardant, water proof, and manufactured by Al Baddad International, Dubai, UAE. On August 5, 2013, Target made a delivery to the Government at Shindand Air Base. The Government acknowledged receipt, but noted that the tent skin delivered by Target was not the Al Baddad tent skin ordered. Mr. Abbott flew to Dubai and met with Mr. Ahmadi in order to oversee the purchase of the correct tent skin. KVG paid for the transport of the correct item.

On August 29, 2013, Target delivered a replacement tent skin to the Government at Shindand Air Base. The tent skin delivered to the Government on August 29, 2013 was the

correct item, and the Government accepted the tent skin. The Government paid KVG for the tent skin Target delivered, and the Government retained possession of the replacement tent skin.

On September 24, 2013, Target invoiced KVG for the tent skin it delivered to Shindand Air Base. KVG paid Target for the tent skin it delivered to Shindand Air Base, and the contract was closed out in 2013. KVG listed this contract as an example of a contract completed to the satisfaction of the Government, and as an example of past contract performance by both KVG and Target, in subsequent proposal packages to the Government.

KVG did not make any further mention with respect to the tent skin until March 20, 2015, approximately 19 months after it had been delivered, and accepted by the Government. The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the tent skin. KVG alleges that it suffered $13,600 (136 hours x $100/hr) in compensatory damages in addressing the nonconforming tent skin. KVG also alleges that it spent $9,600 to another freight forwarder in order to deliver the correct tent skin. In addition, KVG asserts that it lost an additional contract with the U.S. Government because of the tent skin contract, which resulted in lost profits of $32,643.

We conclude that the Government accepted the tent skin delivered with respect to this contract. Although the initial delivery by Target may have not contained the correct item as quoted by the contract, Target replaced that item with the Al Baddad tent skin that was consistent with the contract specifications. The record demonstrates that the replacement tent skin conformed to the contract, and was acceptable to the Government. Because KVG has failed to establish that a nonconforming tent skin was ultimately delivered and accepted by the

59

Government, KVG cannot revoke its acceptance of the tent skin.

Likewise, we find that there was no breach of warranty with respect to the tent skin contract because KVG has failed to establish that the replacement tent skin did not conform to the contract, or was otherwise defective. Based on our review of the record evidence, there is no indication that the Government complained about or attempted to return the replacement tent skin that was delivered by Target on August 29, 2013.[26]

C. Pilot Armor Vests and Plates

In October 2013, Target and KVG entered into an agreement for the purchase and delivery of pilot armor vests to the Afghan Pilot program at Kabul International Airport. On October 27, 2013, Target provided a sample of the armor plates and vests to Mr. Kreck for

---

[26] Even if KVG would have been able to establish a breach with respect to the tent skin contract, we would conclude that KVG's claim for damages is speculative and/or unfounded. With respect to claimed man hours, we note that KVG did not contemporaneously track the time it spent on this contract. In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any issues with this contract until after this case was filed. KVG also did not provide any detail or description of the type of work performed, and failed to provide any corroborating evidence, such as documents or ledgers prepared contemporaneously with the alleged work performed. These man hour estimates are speculative, and do not form an adequate basis for seeking damages.

With respect to KVG's claim that it spent $9,600 for transport, we note that the only evidence on this claimed damage is the testimony of Mr. Abbott. No receipts were submitted to the Court which would support the totality of this expense. This Court has not been advised as to who the alleged freight forwarder was, or whether the payment allegedly made to the freight forwarder by KVG was customary and reasonable in light of the circumstances. KVG has failed to provide adequate proof to this Court, and, accordingly, has not met its burden in establishing a reasonable certainty on this claimed item of damages.

Finally, KVG asserts that it is entitled to damages for lost profits in the amount of $32,643 because it lost a contract with the Government as a result of issues with the tent skin contract. Specifically, Mr. Abbott testified that he was "told by the contracting office" that the Mazar-I-Sharif Medical contract ("MES Hospital Contract") was awarded to another company because of "issues" on the tent skin contract. There are no emails corroborating that a contracting officer told Mr. Abbott this information. In addition, no other witnesses, including Government witnesses, testified at trial that KVG lost the MES Hospital Contract because of any issues concerning the tent skin contract. To the contrary, KVG actually listed the tent skin contract as an example of a contract completed to the satisfaction of the Government in subsequent proposal packages to the Government. KVG failed to present any evidence of proximate causation. Accordingly, we find that KVG failed to prove that the tent skin contract and Target's performance were the proximate cause of any lost profits. Accordingly, even if we were to determine that a breach occurred with respect to the tent skin contract, we conclude that KVG has failed to establish damages.

inspection on behalf of the Government, who found the samples to be of appropriate quality. The manufacturer of the sample plate was Global Armour, South Africa, and the plate was ceramic.

On November 15, 2013, Target delivered plates and vests, but the armor plates delivered were not made of ceramic, and were completely different from the sample previously shown. The plates delivered had numerous defects, including rips, tears, dirt, stains and were not properly labeled. In addition, the vests delivered had no sizes labeled, and appeared to be all the same size, as opposed to the various sizes ordered. These discrepancies were reported to KVG, and Mr. Boyer advised that he would send out Target for replacement.

Target delivered a replacement set of armored plates and vests on or about December 2, 2013. Mr. Kreck commented that the vests in the second shipment seemed sufficient. The armor plates in the second shipment, however, were not accepted. A third delivery of plates was received on or about December 6, 2013. The plates delivered in the third shipment contained the wrong manufacturer name, no manufacturing date, no serial number, and no lot number. The armor plates that were delivered by Target, were taken back by Target, and placed back into Target's stock. According to the record, Target made three deliveries of armored plates that were not accepted. Acceptable armored plates were eventually provided to the Government, but they were not provided by Target.

Based on our review of the record, it is clear that the December 2, 2013 shipment of vests (not armor plates) was deemed sufficient by the Government, and was accepted. The Government paid KVG for the armor vests that Target delivered, and the Government retained possession of the replacement armor vests. KVG paid Target for the vests it delivered, but

Target was not paid for any armor plates that were delivered. The contract was closed out as of January 29, 2014.

KVG did not make any further mention with respect to this contract until March 20, 2015, more than 14 months after KVG paid Target for the vests. The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the armor vests. KVG now alleges that Target breached the express and implied warranties with regard to the nonconforming armor plates and vests. KVG avers that it suffered $12,000 (120 hours x $100/hr) in compensatory damages in addressing the nonconforming armor plates and vests.

As noted above, we conclude that the Government accepted the vests delivered with respect to this contract. Although the initial delivery by Target may have not contained the precise vests as noted by the previously approved samples, Target replaced the vests delivered in the first shipment with those which were deemed sufficient by the Government in the second shipment. There is nothing in the record to suggest that the second shipment of vests was nonconforming. Because KVG has failed to establish that nonconforming vests were ultimately delivered and accepted by the Government, KVG cannot revoke its acceptance of the vests.

With respect to the armor plates, however, we note that there was no acceptance of any of the armor plates delivered by Target, and acceptable armor plates were provided by another source. Target did not receive any payment for the armor plates, and has not made a claim for payment. The contract between KVG and Target as to the armor plates was not completed. Because Target was not able to complete the contract as to the armor plates, we conclude that it breached this part of the contract.

As noted above, KVG alleges that Target breached the express and implied warranties with regard to the nonconforming armor plates and vests. We conclude that there was no breach of warranty with respect to the armor vests because KVG has failed to establish that the replacement vests did not conform to the specifications, or were otherwise defective. Based on our review of the record evidence, there is no indication that the Government complained about or attempted to return the replacement vests that were delivered by Target. With respect to the armor plates, Target failed to deliver, and did not complete that aspect of the contract.

To the extent that we have concluded that Target breached the contract as to its failure to deliver the armored plates, and assuming that KVG's notice of the breach was proper and timely made,[27] we note that KVG claims it is entitled to recover $12,000 in compensatory damages for time spent "fixing the issues" on the contract.[28] Consistent with our determination, *supra*, however, KVG's claim for damages based on man hours expended is speculative and/or unfounded. With respect to claimed man hours, KVG did not contemporaneously track the time

---

[27]     Because we have determined that KVG has failed to establish damages, we find it unnecessary to consider whether KVG gave proper and timely notice of a breach.

[28]     A buyer may recover damages for nondelivery pursuant to 13 Pa.C.S. § 2713, which provides as follows:

> § 2713. Damages of buyer for nondelivery or repudiation.
>
> (a) Damages recoverable.--Subject to the provisions of this division with respect to proof of market price (section 2723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price, together with any incidental and consequential damages provided in this division (section 2715), but less expenses saved in consequence of the breach by the seller.

13 Pa.C.S. § 2713(a). No specific information was provided to the Court concerning the delivery of the armored plates by another source, and because no evidence was presented with respect to any other claimed damages at trial, other than man hours, it does not appear to the Court that KVG is seeking any other damages with respect to this contract.

it spent on this contract.  In fact, the record indicates that KVG did not even calculate the amount of time spent (or the value thereof) addressing any issues with this contract until after this case was filed.  KVG also did not provide any detail or description of the type of work performed, and failed to provide any corroborating evidence, such as documents or ledgers prepared contemporaneously with the alleged work performed.  These man hour estimates are speculative, and do not form an adequate basis for seeking damages.  KVG did not assert, or prove, any other damages at trial with respect to this contract.  Accordingly, KVG is not entitled to any damages.

D. <u>Bagram DFIP Medical Equipment</u>

On August 15, 2013, Target and KVG entered into an agreement for the purchase and delivery of VertX and XRay medical equipment to Bagram Air Base under KVG's contract with the Government.  On December 5, 2013, the Government acknowledged receipt of the medical equipment under this contract, and retained the delivered goods.  The Government signed the DD250 and there is no indication in the record that the Government or KVG returned, or attempted to return, the medical equipment delivered.  The Government paid KVG for the medical equipment, and KVG, in turn, paid Target.  The contract was closed out in 2013, and was listed by KVG as an example of a contract completed to the satisfaction of the Government, in subsequent proposals to the Government when KVG was seeking other contracts.

KVG did not make any further mention with respect to the Bagram DFIP medical equipment until March 20, 2015, approximately 15 months after it had been delivered to the Government, and more than 14 months after KVG paid Target for it.  The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the Bagram DFIP medical

equipment.  During his testimony at trial, Mr. Abbott confirmed that at no point between 2013 and March 2015 did KVG give notice to Target that it was revoking acceptance of the medical equipment, returning the medical equipment, or seeking damages.

Based on the record evidence, we conclude that the Government accepted the goods delivered with respect to this contract.  The record demonstrates that the items delivered conformed to the contract, and were acceptable to the Government.  No proof was offered at trial to establish that any nonconforming goods were delivered or accepted by the Government on this contract.  Accordingly, revocation does not apply.

KVG, however, argues that Target breached this contract by failing to deliver two items,[29] and alleges that it is entitled to the costs for cover and compensatory damages for Target's failure to deliver these two items.  At trial, the representatives from KVG testified that Target failed to procure a portable x-ray machine and a VertX CR reader.  KVG asserts that it

---

[29]     This Court questions when Target actually received notice that KVG planned to pursue damages as a result of this alleged breach.  The record evidence shows that the Bagram DFIP medical equipment contract was closed out in 2013, and was listed by KVG as an example of a contract completed to the satisfaction of the Government, in subsequent proposals to the Government when KVG was seeking other contracts.  KVG did not make any further mention with respect to this contract until March 20, 2015, more than 14 months after its completion.  In fact, Mr. Abbott confirmed at trial that the March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the Bagram DFIP medical equipment.

As noted by Target in its submissions to the Court, several courts have weighed in on what constitutes a reasonable and timely notice of breach. In Cann & Saul Steel Co. v. Silicon Technology Corp., No. 77-1972, 1985 WL 2966, at *11 (E.D. Pa. Oct. 3, 1985), the court found that notice of a supposed breach two years after delivery of accepted goods was "grossly excessive."  In National Container Corp. of Pa., 119 A.2d at 273, the court deemed notice of breach four months after the arrival of the goods to be too late. And in Bomze v. M. Schwartz Textile Corp., 200 Pa. Super. 588, 593 (1931), a buyer's notice of defect 26 days after delivery was held to be unreasonable. The key inquiry is when the non-conformity was or should have been discovered, and when the buyer gave notice of the breach. See David's Bridal, 2015 WL 13651382, at *15 (stating that merchants are held to a higher standard for providing notice than a retail consumer).

Because we have determined that KVG has failed to establish damages, we find it unnecessary to fully consider whether KVG gave proper and timely notice of a breach.

had to locate those items in the United States, and supply them directly to the Government.  KVG

avers that it suffered $43,084 in damages because it had to pay for items that Target could not

deliver, but had previously quoted to KVG.  KVG also alleges that it suffered $10,400 in

compensatory damages for man hours spent as a result of Target's failure to procure these items.

The Pennsylvania UCC provides for damages in the event of nondelivery.

Specifically, 13 Pa.C.S. § 2711, provides, in pertinent part, as follows:

> § 2711.  Remedies of buyer in general; security interest of buyer in
> rejected goods.
>
> > (a)  Cancellation and additional remedies.--Where the seller
> > fails to make delivery . . ., the buyer may cancel and
> > whether or not he has done so may in addition to recovering
> > so much of the price as has been paid:
> >
> > > (1) "cover" and have damages under section 2712
> > > (relating to "cover"; procurement by buyer of
> > > substitute goods) as to all the goods affected
> > > whether or not they have been identified to the
> > > contract; or
> > >
> > > (2)  recover damages for nondelivery as provided in
> > > this division (section 2713 (relating to damages of
> > > buyer for nondelivery or repudiation)).

13 Pa.C.S. § 2711(a).  KVG avers that it is entitled to "cover" in the amount of $43,084 for the

two items that Target failed to procure.  The Pennsylvania UCC section pertaining to cover is 13

Pa.C.S. § 2712, which provides as follows:

> § 2712.  "Cover"; procurement by buyer of substitute goods.
>
> > (a)  Right and manner of cover.--After a breach within
> > section 2711 . . . the buyer may "cover" by making in good
> > faith and without unreasonable delay any reasonable
> > purchase of or contract to purchase goods in substitution for
> > those due from the seller.

> (b) Damages recoverable.--The buyer may recover from
> the seller as damages the difference between the cost of
> cover and the contract price, together with any incidental or
> consequential damages as defined in section 2715 . . . but
> less expenses saved in consequence of the breach by the
> seller.

13 Pa.C.S. § 2712.

The only information provided to the Court concerning this alleged claim for

damages was the testimony of Mr. Abbott. On day four of the non-jury trial, Mr. Abbott testified

as follows:

> The DFIP Hospital, $43,084, represents the difference between
> what we had to pay for the equipment that came from the United
> States, as opposed to what Target had quoted for equipment that
> they were going to procure. So that ate into our margin in that
> contract . . .

(N.T. 5/24/2018 at 62.) In the context of this claim for damages, KVG did not provide the Court

with any documentation supporting the monetary amount claimed. For instance, this Court was

not provided with the actual cost of cover, or any documentation to support that cost. The Court

was not directed to the contract price for each of these items, nor was the Court provided with a

detailed description concerning those items. Without more information, this Court is unable to

determine whether the amount claimed by KVG, $43,084, constitutes a "reasonable purchase"

pursuant to 13 Pa.C.S. § 2712(a).

Consistent with our determination, *supra*, KVG's claim for damages based on

man hours expended is speculative and/or unfounded. With respect to claimed man hours, KVG

did not contemporaneously track the time it spent on this contract. In fact, the record indicates

that KVG did not even calculate the amount of time spent (or the value thereof) addressing any

issues with this contract until after this case was filed. KVG also did not provide any detail or

67

description of the type of work performed, and failed to provide any corroborating evidence, such as documents or ledgers prepared contemporaneously with the alleged work performed. These man hour estimates are speculative, and do not form an adequate basis for seeking damages.

### E. Afghan National Defense University Sports Equipment[30]

On August 28, 2013, Target and KVG entered into an agreement for the purchase and delivery of sports equipment to the Afghan National Defense University under KVG's contract with the Government. In December 2013, Target delivered sports equipment to Afghan National Defense University. On December 15, 2013, the Government acknowledged receipt of the sports equipment under this contract, retained the goods, and paid KVG in full.

KVG paid Target for the sports equipment it delivered, and the contract was closed out in 2013. Neither the Government nor KVG returned the supplied sports equipment that Target delivered. In fact, KVG listed this contract as an example of a contract completed to the satisfaction of the Government, and as an example of past contract performance between Target and KVG in subsequent proposals to the Government when KVG was seeking other contracts.

KVG did not make any further mention with respect to the sports equipment until March 20, 2015, more than 15 months after it had been delivered, and accepted by the Government. The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the sports equipment. Despite acknowledging that it made payment in full under

---

[30] The facts concerning this contract were predominately taken from the post-trial submissions of Target because KVG did not address this contract in its post-trial submissions.

the contract to Target, KVG averred at trial that nonconforming items were delivered.  KVG now alleges that it suffered $14,400 (144 hours x $100/hr) in compensatory damages in addressing this contract.

We conclude that the Government accepted the sports equipment delivered with respect to this contract.  We further conclude that KVG has not met its burden in establishing that nonconforming items were delivered.  To the contrary, the record as presented to the Court, demonstrates that the sports equipment conformed to the contract, and was acceptable to the Government.  Because KVG has failed to establish that nonconforming equipment was ultimately delivered and accepted by the Government, KVG cannot revoke its acceptance.

Likewise, we find that there was no breach of warranty with respect to the sports equipment because KVG has failed to establish that the equipment did not conform to the contract, or was otherwise defective.  Based on our review of the record evidence, there is no indication that the Government complained about or attempted to return the sports equipment that was delivered by Target.  KVG is not entitled to damages.

F. Kandahar Regional Medical Equipment[31]

On July 19, 2013, Target and KVG entered into an agreement for the purchase and delivery of medical equipment for the Kandahar Regional Medical Center.  On or about October 2, 2013, Target delivered medical equipment to the Government, and the Government acknowledged receipt of the medical equipment under the contract.  The Government retained possession of, and did not reject or attempt to return, the medical equipment.  The Government

---

[31]     The facts concerning this contract were predominately taken from the post-trial submissions of Target because KVG did not address this contract in its post-trial submissions.

paid KVG in full for the medical equipment delivered by Target. KVG paid Target for the medical equipment it delivered, and the contract was closed out in 2013. KVG listed this contract as an example of a contract completed to the satisfaction of the Government in subsequent proposal packages to the Government when KVG was seeking other contracts.

KVG did not make any further mention with respect to the Kandahar medical equipment until March 20, 2015, more than 17 months after it had been delivered, and accepted by the Government. The March 20, 2015 letter was the first time KVG informed Mr. Ahmadi that it was considering seeking damages against Target for several of the parties' contracts, including the delivery of the medical center equipment. No evidence was presented at trial about any damages suffered by KVG as a result of this contract.[32]

We conclude that the Government accepted the medical equipment delivered with respect to this contract. We further conclude that KVG has not met its burden in establishing that any nonconforming items were delivered. To the contrary, the record as presented to the Court, demonstrates that the medical equipment delivered conformed to the contract, and was acceptable to the Government. Because KVG has failed to establish that nonconforming medical equipment was ultimately delivered and accepted by the Government, KVG cannot revoke its acceptance.

Likewise, we find that there was no breach of warranty with respect to the medical equipment delivered to Kandahar because KVG has failed to establish that the medical equipment did not conform to the contract, or was otherwise defective. Based on our review of

---

[32] This Court did not hear any testimony concerning damages claimed by KVG, nor was this contract listed on KVG's chart of claimed damages, Defendant Exhibit 185, which was admitted into evidence.

the record evidence, there is no indication that the Government complained about or attempted to return the medical equipment that was delivered by Target to Kandahar.

### G. Kandahar Power Consumables

On May 21, 2014, Target and KVG entered into an agreement for the purchase and delivery of power plant consumables for delivery to Kandahar Province under KVG's contract with the Government, Contract No. W56KJD-14-C-009.  On May 30, 2014, Target informed KVG it could not provide two items required under the contract for the quoted price because it had underbid those items by approximately $900,000.  Less than 10 days from the date of the award, KVG then informed the Government of the mistake in the bid, and requested that the Government terminate the contract for convenience.  On June 14, 2014, the contract was terminated for the Government's convenience prior to delivery at no cost to the parties.  KVG flowed down the same terms, of no-cost, that it received from the Government, to Target.  The contract was terminated for convenience, and closed out, in June 2014.  KVG did not make any further mention with respect to the Kandahar power consumables contract until March 20, 2015, nearly 9 months after the termination for convenience.

KVG alleges that Target breached this contract.  However, it appears from the documentation submitted to this Court that the Government terminated this contract for its convenience.  Specifically, the CENTCOM letter dated June 14, 2014, which was addressed to Mr. Abbott, provides, in pertinent part, as follows:

> SUBJECT:  W56KJD-14-C-0009, Termination for Convenience, No Cost Settlement
>
> 1. You are hereby notified that Contract W56KJD-14-C-0009 is terminated in its entirety.  This Contract was for the purchase of Power Plant Consumables.  The contract in its entirety is hereby

terminated for the US Government's convenience.

2. Particulars:

    a. Date Termination Notice issued: 14 June 2014

    b. Effective Date of Termination: Date same as above

    c. Reason for Termination: Documentation in the form of email correspondence between KVG, LLC and the government has concluded that no power plant consumables have been delivered by your company during the ordering period of delivery.

3. Cessation of work and notification to immediate subcontractors:

    a. You shall stop all work, make no shipments, and place no orders relating to the contract after the effective date in paragraph 2.a. above.

.    .    .

4. Submission of Settlement Proposal: This is a No Cost Settlement. You are not authorized to submit a settlement proposal.

(Def. Ex. 181.) The contract was terminated for the Government's convenience prior to delivery at no cost to the parties. Mr. Boyer confirmed at trial that KVG flowed down the same terms, of no-cost, that it received from the Government, to Target. Because this contract was ultimately terminated by the Government for its own convenience, and foregoing terms were extended to Target, this Court is unable to conclude that Target breached this contract.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties.

2. The claims and counterclaims are controlled by Pennsylvania law, specifically Pennsylvania's Uniform Commercial Code, Article 2, 13 Pa.C.S. § 2101 et seq.

<u>Shorabak Contract</u>

3. The Court finds that there was a valid contract of sale between Target and KVG.

4. The Court finds that KVG and the Government accepted the goods delivered by Target, and KVG did not reject or revoke the goods delivered.

5. The Court finds that KVG contracted to pay $678,534.84 to Target following completion of the Shorabak Contract. This amount was not paid, and is owing.

6. The Court finds that some of the goods delivered by Target to Shorabak were nonconforming goods in that they did not conform to the specifications of the contract.

7. The Court finds that by the delivery of some nonconforming goods, Target breached the express warranty that all of the goods delivered on the Shorabak Contract would be new items with specific brand and part numbers.

8. The Court finds that KVG notified Target within a reasonable amount of time as to the delivery of nonconforming goods and breach of the express warranty under the contract.

9. The Court finds that KVG has a valid counterclaim of damages for breach of warranty in the amount of $38,241.20.

10. The Court finds that KVG owes Target $640,293.64, plus interest,[33] which amount represents

---

[33] Under Pennsylvania law, prejudgment interest is mandated by statute, 41 P. S. § 202, which provides as follows:

> Reference in any law or document enacted or executed heretofore or hereafter to "legal rate of interest" and reference in any document to an obligation to pay a sum of money "with interest" without specification of the applicable rate shall be construed to refer to the rate of interest of six per cent per annum.

<u>Id.</u> The statutory legal rate of interest is simple interest and may not be compounded. <u>Ralph Myers Contracting Corp. v. Pa. Dep't of Transp.</u>, 436 A.2d 612, 614 (Pa. 1981) ("It is generally true that the law of this Commonwealth frowns on an award of compound interest on a debt except where the parties agree to it or a statute expressly authorizes it.").

the amount due on the contract of sale ($678,534.84) reduced by the amount awarded on KVG's breach of warranty claim ($38,241.20).

Paktiya Contract

11. The Court finds that there was a valid contract of sale between Target and KVG.

12. The Court finds that KVG and the Government accepted the goods delivered by Target, and KVG did not reject or revoke the goods delivered.

13. The Court finds that KVG contracted to pay $179,136.48 to Target following completion of the Paktiya Contract. This amount was not paid, and is owing.

---

Under Pennsylvania's common law rules governing prejudgment interest in contract actions, "even where a party's right to the payment of interest is not specifically addressed by the terms of a contract, a nonbreaching party to a contract may recover, *as damages*, interest on the amount due under the contract." Truserv Corp. v. Morgan's Tool & Supply Co., Inc., 39 A.3d 253, 263, 264-65 (Pa. 2012) (emphasis in original). Pennsylvania's Supreme Court "refers to such interest as prejudgment interest." Id. at 263. Eligibility for prejudgment interest is determined under the Restatement (Second) of Contracts, which provides in pertinent part:

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

Id. § 354 (1981). Pennsylvania's Supreme Court has long adhered to that rule for the recovery of prejudgment interest as damages in breach of contract actions:

> "For over a century it has been the law of this Commonwealth that the right to interest on money owing upon contract is a legal right. West Republic Mining Co. v. Jones & Laughlins, 108 Pa. 55 (1885). That right to interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment. Palmgreen v. Palmer's Garage, Inc., 383 Pa. 105, 108, 117 A.2d 721, 722 (1955)."

Truserv Corp., 39 A.3d at 263 (quoting Fernandez v. Levin, 548 A.2d 1191, 1193 (Pa. 1988) (adopting Section 354)); see also Penneys v. Pennsylvania R.R. Co., 183 A.2d 544 (Pa. 1962) (adopting Section 337(a) of the Restatement (First) of Contracts (1932), which was amended and renumbered as Section 354 in the Restatement (Second) of Contracts).

Under Section 354(1), an award of prejudgment interest is measured by the statutory legal rate of interest, 41 P.S. § 202. Peterson v. Crown Fin. Corp., 661 F.2d 287, 293 (3d Cir. 1981) (citing Miller v. City of Reading, 87 A.2d 223 (Pa. 1952)). Furthermore, an award "is not subject to a court's discretion." Truserv Corp., 39 A.3d at 264 (citing Peterson, 661 F.2d at 293 (a court is "obligated to award 'simple interest at the statutory legal rate'" where "the plaintiff proves that the defendant breached a promise to pay 'a definite sum of money.'")).

14. The Court finds that some of the goods delivered by Target to Paktiya were nonconforming goods in that they did not conform to the specifications of the contract.

15. The Court finds that by the delivery of some nonconforming goods, Target breached the express warranty that all of the goods delivered on the Paktiya Contract would be new items with specific brand and part numbers.

16. The Court finds that KVG notified Target within a reasonable amount of time as to the delivery of nonconforming goods and breach of the express warranty under the contract.

17. The Court finds that KVG has a valid counterclaim of damages for breach of warranty in the amount of $63,519.74.

18. The Court finds that KVG owes Target $115,616.74, plus interest, which amount represents the amount due on the contract of sale ($179,136.48) reduced by the amount awarded on KVG's breach of warranty claim ($63,519.74).

KVG's Counterclaim - Pilot Armor Plates

19. The Court finds that there was a valid contract of sale between Target and KVG.

20. The Court finds that although Target attempted delivery of armored plates to the Government on three separate occasions, none of the armored plates were accepted by the Government.

21. The Court finds that Target failed to deliver acceptable armored plates to the Government.

22. The Court finds that because Target failed to deliver acceptable armor plates, Target breached this portion of the contract.

23. The Court finds that KVG has failed to establish any damages with sufficient evidence.

KVG's Counterclaim - Bagram DFIP Medical Equipment

24. The Court finds that there was a valid contract of sale between Target and KVG.

25 The Court finds that KVG and the Government accepted the goods delivered by Target, and KVG did not reject or revoke the goods delivered.

26. The Court finds that KVG failed to establish that nonconforming goods were delivered.

27. The Court finds that KVG failed to establish a breach of warranty with respect to the goods delivered.

28. The Court finds the Target failed to deliver two items under the contract.

29. The Court finds that KVG has failed to establish any damages with sufficient evidence.

KVG's Counterclaim - Kandahar Power Consumables

30. The Court finds that there was a valid contract of sale.

31. The Court finds that on June 14, 2014, the Government terminated the contract in its entirety for its own convenience.

32. The Court finds that the contract was terminated for the Government's convenience prior to delivery at no cost to either KVG or Target.

33. The Court finds that KVG has failed to establish a breach of this contract.

KVG's Remaining Counterclaims - Bagram Flagpole, Shindad Tent Skin, Pilot Armor Vests, Afghan National Defense University Sport Equipment, Kandahar Regional Medical Equipment

34. The Court finds that there was a valid contract of sale between Target and KVG on each of these counterclaim contracts.

35. The Court finds that KVG and the Government accepted the goods delivered by Target on each of the counterclaim contracts, and KVG did not reject or revoke the goods delivered with respect to any contract.

36. The Court finds that KVG failed to establish that nonconforming goods were delivered with respect to any contract.

37. The Court finds that KVG failed to establish a breach of warranty with respect to the goods delivered on any contract.

38. The Court finds that KVG has failed to establish any damages with sufficient evidence.

## **VERDICT**

After a non-jury trial held on May 21-24, and 30, 2018, and a thorough review of all of the evidence in this case, the Court finds in favor of Target and against KVG in the amount of $755,910.38, plus applicable interest.  A Judgment and Order consistent with this Memorandum will be docketed separately.